Lyta J. Morris, Formerly Lyta Jorgensen Hayman v. Commissioner. Max Hayman and Lee Titelman Hayman v. Commissioner.
Morris v. Commissioner
Docket Nos. 3498-64, 3537-64.
United States Tax Court
T.C. Memo 1966-245; 1966 Tax Ct. Memo LEXIS 39; 25 T.C.M. (CCH) 1248; T.C.M. (RIA) 66245; October 31, 1966
Martin S. Stolzoff, 9465 Wilshire Blvd., Beverly Hills, Calif., for the petitioner in Docket No. 3498-64. Bernard Shearer, 9255 Sunset Blvd., Los Angeles, Calif., for the petitioners in Docket No. 3537-64. John Schessler, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in the income taxes of petitioners *41 for the years 1956, 1957, and 1958, as follows: Petitioner
Docket No.
Year
Amount
Lyta J. Morris
3498-64
1956
$ 4,603.10
1957
3,274.24
1958
4,209.32
Max Hayman and
Lee Titelman
Hayman
3537-64
1958
11,110.79
In regard to the tax year 1957, in Docket No. 3498-64, apart from the deficiency determined above, respondent made an assessment in the sum of $8,191.57 representing an erroneous refund and the interest attributable thereto. [1] In an amendment to his answer in Docket No. 3498-64, respondent sought an additional deficiency in the amount of $4,257.01 for the year 1958. The only issue presented for the year 1956 is whether respondent's determination of a deficiency against Lyta J. Morris for that year was barred by the statute of limitations. For the year 1957, the principal issue in Docket No. 3498-64 is whether respondent's determination of a deficiency for that year was timely. If so, the following supplemental issues must be resolved: (a) Whether petitioner is entitled to certain "community deductions"; (b) whether she is entitled to utilize head of *42 household rates; (c) whether she is entitled to a deduction under section 214 of the Internal Revenue Code of 1954; [2] and (d) whether she is entitled to a credit for one-half of the total payments made by her then husband on his 1957 declaration of estimated tax. If respondent does not have a 6-year period in which to do so, he concedes that his assessment and collection of the erroneous refund was not timely, but urges that he may retain a right to the payment under the doctrine of Lewis v. Reynolds, 284 U.S. 281 (1932). In 1958, respondent has alternatively determined each common issue against petitioners in both dockets. The issues, common to both dockets, are: (1) Whether Lyta J. Morris is taxable on one-half of the income earned by Max Hayman during 1958, prior to the final divorce decree on November 28, 1958, or is Max Hayman taxable on all his income. (2) Whether Max Hayman is entitled to an alimony deduction for any part of the payments made by him to petitioner Lyta J. Morris during 1958, and, conversely, whether Lyta J. Morris is *43 required to include any portion of these payments in her gross income for the year 1958. (3) Whether the petitioners in Docket No. 3498-64 or in Docket No. 3537-64 may properly deduct expenditures made by Max Hayman for the following items: a. Tax payments made on his individual declaration of estimated tax. b. Interest payments. c. State tax payments. d. Legal expenses. (4) Whether Lyta J. Morris or Max Hayman is properly entitled to dependency exemptions. The last issue is whether petitioner in Docket No. 3498-64 is entitled to entertainment expenses in excess of the amount allowed by respondent. [3]
General Findings of Fact Some of the facts have been stipulated, and the stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Lyta J. Morris, formerly Lyta Jorgensen Hayman (hereinafter referred to as Lyta), an attorney, filed her individual Federal income tax returns for the calendar years 1956, 1957, and 1958 on the cash basis with the district director of internal *44 revenue at Los Angeles, California. Max Hayman (hereinafter referred to as Max), a physician, and Lee Titelman Hayman, husband and wife, filed their joint Federal income tax return for the calendar year 1958 on the cash basis with the district director of internal revenue at Los Angeles, California. Lyta and Max had been previously married to each other. On November 27, 1957, they obtained an interlocutory decree of divorce, and on November 28, 1958, a final decree was entered in said divorce proceeding. Throughout this entire period they had been residents of and domiciled in the State of California, a community property state. In the interest of clarity, individual Findings of Fact and Opinions will be made with regard to each issue presented. Issue - Statute of Limitations on Assessment and Collection for the Years 1956 and 1957, Docket No. 3498-64 Lyta did not file a timely Federal income tax return for the year 1956. On or about March 10, 1958, she filed an affidavit with the district director explaining her failure to file a timely return and requested permission to file a delinquent return for 1956 concurrently with her 1957 return. On April 15, 1958, she filed both *45 the 1956 and 1957 returns and enclosed a copy of the aforementioned affidavit. In addition to attaching the copy of the affidavit to the returns, the 1956 return contained a statement of fact that the original affidavit was on file with the district director. After having filed the returns, she received a letter from the district director acknowledging his receipt of the original affidavit. The affidavit, in addition to a justification for the delinquent filing of the return for 1956, contained the following: Affiant believes that the amount previously paid on the first three installments of 1956 taxes, may be sufficient to cover her separate tax liability for 1956. However, she has as yet no information concerning the true and correct amount earned by Max Hayman from January 1, 1956, to September 1, 1956 (the date of the order for alimony pendente lite); and affiant is therefore without information concerning the amount of income which may be chargeable to her by reason of her community share of such earnings. Affiant has requested the court, and the court has granted affiant's request, that the matter be reopened for an accounting concerning 1956 and 1957 income, and concerning *46 the respective obligations of the parties to each other with regard to the taxes on such income. Pending such an accounting (now scheduled to begin on or about March 20, in the courtroom of Judge Orlando Rhodes, Superior Court of the County of Los Angeles), your affiant is uncertain as to the true nature and extent of her income tax liability. She prays permission to file her separate income tax return for 1956, after the completion of said accounting. Affiant has paid, in January, 1958, the entire amount which she estimates to be her separate tax liability for the calendar year 1957; she will file her final return thereon, on or before April 15, 1958. [Emphasis supplied] For the years 1956 and 1957 Max had net professional earnings in the amount of $18,550.78 and $23,541.69, respectively. For the year 1956 Max had gross professional earnings of $48,902.02 and business deductions in connection therewith of $30,351.24. For the year 1957 Max had gross professional earnings of $43,730.17 and business deductions in connection therewith of $20,188.48. No portion of Max's net earnings was reported by Lyta on her individual income tax returns for either year. Her failure to do so *47 was the result of a lack of available information as to Max's earnings for these two years. Her returns were prepared solely on the basis of her separate tax liability for each year. On April 15, 1964, more than three years after the filing of Lyta's 1956 and 1957 returns, respondent, in his statutory notice of deficiency, determined a deficiency in Lyta's income taxes for each year. In making this determination, respondent relied upon the 6-year statute of limitations prescribed in section 6501(e)(1)(A). Opinion The notice of deficiency sent April 15, 1964, was mailed more than three years after the date on which the returns were filed, April 15, 1958. Lyta contends that on these facts the deficiency is barred by section 6501(a), [4] which prescribes a 3-year statute of limitations. Respondent, however, contends that the notice was timely under section 6501(e)(1)(A), [5] having been mailed within six years of the date on which the returns were filed. Under that section, a 6-year statute of limitations will apply where the taxpayer has omitted from gross income an amount in excess of 25 percent of the amount of gross income shown on the return. However, in determining the amount *48 omitted, subsection (ii) provides that - *49 there shall not be taken into account any amount which * * * is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item. Lyta has conceded that amounts in excess of 25 percent were omitted from gross income. Her community share of Max's gross professional earnings was $24,451.01 in 1956 and $21,865.08 in 1957. She contends, however, that the affidavit adequately apprised respondent of that fact and, therefore, under subsection (ii), such amount must be excluded from the amount treated as "omitted." We agree with Lyta. The burden of proof with regard to the applicability of section 6501(e)(1)(A) is on the respondent. He must show that the taxpayer omitted from gross income an amount properly includable therein and that the amount so omitted was in excess of 25 percent of the gross income reported on the taxpayer's return. Estate of John Iverson 27 T.C. 786, 792 (1957), affd. 255 F. 2d 1 (C.A. 8, 1958), certiorari denied *50 358 U.S. 893 (1958). To prove that an amount was omitted, respondent must show that the amount was not adequately disclosed on the return or in a statement attached to the return. Respondent has failed to meet his burden of proof. Moreover, we believe the affidavit attached to both the 1956 and 1957 returns adequately disclosed the omission. In the affidavit attached to both returns, Lyta stated that she had no information concerning the nature and amount of her husband's earnings, and that because of this she was unable to determine the amount of income allocable to her by reason of her community share of such earnings. It is difficult to imagine how she could have been more specific under the circumstances. Respondent would have us ignore the affidavit because its purpose was merely to explain the delinquent filing of the 1956 return and was not specifically intended to advise respondent of omissions from gross income for the years 1956 and 1957. However, we do not believe that the intent behind the disclosure is relevant so long as the disclosure itself apparently apprises respondent of the omission. We are also of the opinion that the language of subsection (ii) *51 of the statute does not require, as respondent contends, specific disclosure of the dollar amount omitted. The statute on its face is ambiguous. The repetitious use of the word "amount" leads us to the belief that Congress was not concerned with actual disclosure of the specific dollar amount, and we must therefore look to the legislative history in order to determine the intent of Congress in this area. Our search of the relevant legislative materials reveals that Congress did not intend to limit the application of subsection (ii) to cases in which the actual dollar amount is revealed. On the contrary, it appears that Congress conceived of "adequate disclosure" in terms of "adequate information" as to a particular item, rather than a list of specific facts to be disclosed. H. Rept. No. 1337, to accompany H. R. 8300 (Pub. L. 591), 83rd Cong., 2d Sess., p. A415 (1954); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83rd Cong., 2d Sess., p. 584 (1954). As the Supreme Court stated in the case of Colony, Inc. v. Commissioner, 357 U.S. 28, at p. 36 (1958) - We think that in enacting § 275(c) [now section 6501(e)(1)(A)] Congress manifested no broader purpose *52 than to give the Commissioner an additional two years [now three years] to investigate tax returns in cases where, because of a taxpayer's omission to report some taxable item, the Commissioner is at a special disadvantage in detecting errors. In such instances the return on its face provides no clue to the existence of the omitted item. On the other hand, when, as here, the understatement of a tax arises from an error in reporting an item disclosed on the face of the return the Commissioner is at no such disadvantage. * * * [Emphasis supplied] None of the cases relied on by respondent supply authority for the proposition that the actual dollar amount must be disclosed. See Slaff v. Commissioner, 220 F. 2d 65 (C.A. 9, 1955), reversing a Memorandum Opinion of this Court; Lawrence v. Commissioner, 258 F. 2d 562 (C.A. 9, 1958), reversing per curiam 27 T.C. 713 (1957), and Elliott J. Roschuni, 44 T.C. 80 (1965). Therefore, we hold that the affidavit adequately apprised the respondent of the omitted item for both 1956 and 1957.[6] Because petitioner adequately apprised respondent as to the omission of community income from her return, *53 section 6501(e)(1)(A) requires that this amount be excluded in determining the amount omitted from gross income. Due to this exclusion, the omission does not equal an amount in excess of 25 percent of the gross income shown on the return as required by section 6501(e)(1)(A). Consequently, the general 3-year statute of limitations (section 6501(a)) which bars a deficiency notice mailed more than three years after the date on which the return was filed applies to the instant case and respondent's notice for the years 1956 and 1957 was untimely. For the reasons stated above, we hold for Lyta on this issue. Respondent concedes that if his notice of deficiency for 1956 and 1957 *54 was untimely, his adjustments for those years are invalid. We agree. Issue - 1957 Erroneous Refund - Statute of Limitations on Assessment and Collection, Docket No. 3498-64. Findings of Fact On her return for the year 1956, Lyta showed an overpayment in the amount of $5,752.28. She did not, however, indicate in the appropriate space on the return whether this amount was to be refunded to her or was to be applied as a credit against her 1957 tax. In computing her 1957 tax, she applied the 1956 overpayment as a credit on her return. This had the effect of increasing the overpayment shown on her 1957 return from $2,187.56 to $7,939.84. Again she failed to indicate in the appropriate space on the return whether this latter amount should be refunded to her or should be applied against her 1958 tax liability. On May 13, 1958, Lyta received a refund check in the amount of $7,939.84 which respondent has characterized as being the overpayment shown on her 1957 return. Lyta, on receipt of the refund check and during May 1958, notified the district director, in a letter, that she could not understand why the refund check had been sent. Respondent replied, in a letter dated June 18, 1958, that *55 she had every right to cash the check. On June 2, 1958, after Lyta's letter of May 1958 but prior to the respondent's letter in answer thereto of June 18, 1958, Lyta received a second refund check in the amount of $5,752.28, which was also designated as a tax refund. On June 14, 1958, prior to respondent's reply to her earlier letter, Lyta again notified respondent that the checks had been erroneously sent. Respondent never replied to this latter correspondence, and in September 1958 Lyta cashed both checks. On April 9, 1964, respondent assessed the amount of $7,817.98, representing the erroneous portion of the tax credit refunded to Lyta for the year 1957 ($5,752.28 plus interest on that amount of $2,065.70). On May 7, 1965, this amount plus a statutory addition of $373.59 (totaling $8,191.57) was collected by way of a levy on funds of Lyta on deposit at the Lytton Savings & Loan Association. Opinion Respondent has conceded that in the event we hold section 6501(e)(1)(A) to be inapplicable his assessment on April 9, 1964, was untimely and the collection by levy on May 7, 1965, was invalid. However, on brief, respondent urges that he has retained a right to this amount under *56 the doctrine of Lewis v. Reynolds, supra. We find this contention to be without merit. In that case the Supreme Court held that in the defense of a suit for refund, the Commissioner may introduce evidence of additional errors in the return even though a deficiency based upon these items would be barred by the statute of limitations. The Supreme Court noted at p. 283 that - Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded. [Emphasis supplied] The doctrine of Lewis v. Reynolds was originally posed and has been subsequently applied where the Commissioner had made a timely assessment and collection. See Larrabee v. United States, 37 F.R.D. 61 (D.C.S.D. Cal. 1965); Estate of Ostella Carruth, 28 T.C. 871, 880 (1957). The rationale underlying Lewis v. Reynolds is not properly applicable where, as here, the assessment and collection by the Commissioner was illegal. To apply Lewis v. Reynolds in the instant case would *57 allow the Commissioner to circumvent the statute of limitations and render it a nullity. The idea that the Commissioner can illegally assess and collect a tax and later defend his action by reliance on items closed to him by the statute of limitations is repugnant to the concept of a limitations statute. We, therefore, hold that the assessment of April 9, 1964, was barred by the statute of limitations and that the doctrine of Lewis v. Reynolds is inapplicable on the facts before us. Issues Common to Both Dockets, 1958 (1) Community Income Findings of Fact For the period January 1, 1958, to November 28, 1958, the date of the final decree of divorce, Max had net professional earnings of $32,557.40. Respondent has taken the protective position of taxing the disputed income alternatively to petitioners in both dockets. Opinion Under the law of the State of California for the year 1958, the earnings of a husband, up to the date of the final divorce decree, are community property. Cal. Civil Code, section 161(a), later amended by section 169.2 (1959). See also, *58 Harrold v. Harrold, 43 Cal. 2d 77, 79, 271 P. 2d 489 (1954). Community property is allocable one-half to each spouse, and this allocation is controlling for tax purposes. United States v. Malcolm, 282 U.S. 792 (1931); Ethel B. Dunn, 3 T.C. 319 (1944); Marjorie Hunt, 22 T.C. 228 (1954). The interest of the wife in the community earnings of the husband continues until the marriage is terminated by death or divorce, and an interlocutory decree of divorce, which does not adjudicate the community interests of the parties, does not terminate the community. Ethel B. Dunn, supra; In Re Williams' Estate, 36 Cal. 2d 289, 223 P. 2d 248 (1950). We hold, therefore, that one-half of Max's net professional earnings for the period January 1, 1958, to the date of the final decree of divorce, November 28, 1958, are properly allocable to Lyta. (2) Alimony Payments Findings of Fact During the entire year, Max's net professional earnings, held above to be allocable one-half to Lyta, were deposited in an account (hereinafter referred to as the community account) at the Bank of America. During the year 1958, Max paid *59 to Lyta from the community account the sum of $4,933.28 pursuant to a court order providing for monthly alimony payments. Of this amount, $366.66 was paid on December 1, 1958, after the final decree of divorce had been entered. The payments were made by Max from the community account. The respondent has conceded, and properly so, that the payment on December 1, 1958, constituted gross income to Lyta under section 71(a)(1) and a deduction to Max under section 215. The balance of the payments, those made prior to the entry of the final divorce decree, represent the only amount remaining in issue. Respondent has again taken the protective position of deciding the issue adversely to petitioners in both dockets. Opinion Max contends that if one-half of that account is allocable to him, one-half of the payments from such account should be deductible by him under section 215. [7] Respondent, on the other hand, contends that section 215 applies only to payments made from the husband's income and does not extend to payments made from community income. (It might be noted that due to a change in California law in 1959, which declared that income earned by the husband after the interlocutory *60 decree is his separate property, this question is rendered moot for subsequent years.) We are of the opinion that this situation is governed by our decision in Marjorie Hunt, supra. In the Hunt case, we held, inter alia, that amounts paid as support and maintenance pursuant to a court order, when paid out of community funds, were not deductible by the husband under section 215. Though the Hunt case involved a decree of separate maintenance rather than an interlocutory decree of divorce as in the present situation, there is no significant difference between it and the instant case. Although the result in Hunt was changed by an amendment to California law in 1951, section 169.1 of the California Civil Code, relating to separate maintenance decrees, the parallel amendment in reference to an interlocutory decree, section 169.2, California Civil Code, was not enacted until 1959. *61 Therefore, for the year 1958, the rationale of the Hunt case is controlling where the payments are made from community earnings. The Hunt case is merely a recognition of the precept of California law, that community property, other than by agreement of the parties or by statute, cannot be forcibly divided during the continuation of the marriage community. See Britton v. Hammell, 4 Cal. 2d 690, 52 P. 2d 221 (1935). It cannot, therefore, be said that payments are from the husband's income either totally or partially. They are, rather, from community property. We, therefore, hold that, following our decision in the Hunt case, no part of the payments in 1958, made prior to the entry of the final decree, can be deducted by Max under section 215. (3) Tax Credits and Deductions During the year, Max's net professional earnings, held to be community property, were deposited in the community account, and all payments unless specified to be otherwise were made from the community account. It is Lyta's contention that one-half of all the following payments are allocable to her. a. Estimated Tax Payments Findings of Fact During 1958, Max filed an individual declaration *62 of estimated tax and made estimated tax payments in the amount of $10,577.40. Max took a tax credit for this amount on his 1958 Federal income tax return. Of this amount, $1,000 was paid from Max's separate property. The balance, $9,577.40, was paid out of the community account. Lyta also filed an individual declaration of estimated tax for the year 1958. Opinion Under section 6015(b), in order to divide estimated tax payments between a husband and wife, a joint declaration of estimated tax is required. No joint declaration was made in this case. On the contrary, the record reveals that both Lyta and Max filed individual declarations of estimated tax for the year 1958. It is, therefore, held that Lyta is not entitled to any portion of Max's estimated tax payments for the year 1958. b. Interest Payments Findings of Fact Max made interest payments during 1958, in the amount of $847.97. Of this amount, $332.97 was stipulated by the parties to be in payment of his separate obligations and, therefore, is not in issue. A second amount, $233.36, was paid by Max to his sister as interest on a loan. In 1957, Pearl Kasler, Max's sister, loaned to Max $10,000 on his personal credit *63 rather than on the credit of the community. In advancing the money, Pearl looked solely to Max for payment. The balance of the interest payments, $281.64, was paid by Max to his attorneys. Just prior to payment to his attorneys, Max transferred from his separate funds an amount sufficient to cover the payment of $281.64 to his attorneys. Such transfer was made to the community account in order to enable Max to make the payment from his business account (which has been and will continue to be referred to as the community account). All of the above amounts were paid out of the community account. Opinion The burden of proof is upon Lyta to show by competent evidence that she is entitled to the deductions claimed. Ernest W. Clemens, 8 T.C. 121 (1947). To meet this burden, she must first demonstrate that the debts were community obligations. Under California law a debt which arose during the marriage is presumed, in the absence of contrary evidence, to be a community obligation. Grolemund v. Cafferata, 17 Cal. 2d 679, 111 P. 2d 641 (1941). She must also demonstrate that these community obligations were paid with community funds. Again, under California *64 law, it is presumed, in the absence of contrary evidence, that community property was used to satisfy community obligations. Huber v. Huber, 27 Cal. 2d 784, 167 P. 2d 708 (1946). The net effect of these presumptions is that Lyta's burden is merely to show that the debts arose during the marriage. If this burden is met, the presumptions will operate to conclude, first, that the debt was that of the community and, second, that the debt was satisfied with community funds. The burden is then shifted to Max to rebut the presumptions by showing either that the debt was his separate obligation or that it was paid with his separate funds. The $233.36 interest payment to Pearl Kasler is not deductible at all by Lyta since she has failed to show that this was a community debt. Also the presumption of California law, that a debt arising during the marriage is a community obligation, is overcome here by the presence of sufficient evidence to the contrary. The record reveals that the loan and the interest thereon were the separate obligations of Max. The loan was made to him solely on his individual credit, not on the credit of the community. In addition, the lender looked solely *65 to Max for repayment of the loan. Under such circumstances, California law classifies the obligation as separate rather than community. See Stewart v. Stewart, 113 Cal. App. 334, 298 P. 83 (1931); Moulton v. Moulton, 182 Cal. 185, 187 P. 421 (1920). Since the interest paid was not a payment of a community debt, no part of said interest payment is allocable to, or deductible by, Lyta. The $281.64 interest payment by Max was made to his attorneys. The record does not reveal the nature of the obligation which gave rise to the payment. In the absence of any evidence to the contrary and since the debt arose during the marirage, it is presumed that the obligation was that of the community. Payment of this amount came from the community account. However, this payment can be traced to Max's separate funds which he transferred to the community account just prior to the time he made the payment to his attorneys. Under California law, if it can be shown that separate funds are used to pay a debt, the debt is not chargeable against the community, nor is it deductible as a community expense, whether or not the debt is paid out of the community account. *66 Thomasset v. Thomasset, 122 Cal. App. 2d 116, 264 P. 2d 626 (1953). It has been held that where funds are commingled, as in a single bank account and the amount of separate property contained therein is known, the separate property will not lose its separate character. Huber v. Huber, supra.Prior to payment to his attorneys, Max deposited "a like sum" in order to cover the payment Under the Huber case, this is sufficient evidence to show that separate funds were used to pay the debt. Therefore, the payment is not deductible as a community expense. Thomasset v. Thomasett, supra. c. State Tax Payments Findings of Fact Max made payments for state taxes in the year 1958 in the amount of $1,073.07. The parties have stipulated that $360.22, paid for property taxes, was properly deductible in its entirety by Max. Two of the remaining tax payments were $23, license fees, and $510 for sales and gasoline taxes. Both payments were made with funds from the community account. The record is barren as to how and when such obligations arose and when they were paid. Finally, Max made a payment of $179.85 for state income taxes during 1958. This payment *67 was also made from the community account. Max allocated $150 out of these amounts to Lyta and claimed the balance as a deduction in his return. Respondent has conceded the propriety of Max's allocation. Opinion Again, Lyta has the burden of showing that the debts were (1) community obligations and (2) paid with community funds. We are of the opinion that she has failed to meet her burden. The record does not disclose any evidence that the payments for license fees and gasoline and sales taxes were payments of community debts. Nor has Lyta shown when these obligations arose. Without affirmative evidence that they arose during the marriage, we cannot presume that they are community debts. With regard to the payment of the state income taxes, Cal. Rev. and Tax. Code section 18555[8] states that a husband's liability for such tax on his share of community income is his separate debt unless the parties filed a joint income tax return for that year or the wife controlled, received, or spent some portion of his allocable share of that income. Lyta has not shown that they filed a joint California state income tax return nor has she produced any evidence on *68 the latter conditions. She has, therefore, failed to meet her burden of showing that this amount was in satisfaction of a community debt. We, therefore, hold that the state income tax payment made by Max was the payment of his separate obligation and no part of this payment is deductible by Lyta. We, consequently, hold that Lyta has not established her right to any amount in excess of the $150 allocated to her by Max. d. Legal Expenses Findings of Fact Max made payments to his attorneys during 1958 of $7,781.64. Such payments were made from the community account. Prior to this payment, Max transferred funds, from his separate account, to the community account, in an amount sufficient to cover this payment of $7,781.64. This transfer was *69 made to provide the funds necessary to cover the payment to his attorneys. The payments may be allocated as follows: (1) $2,178.86 for legal services rendered in connection with a certain action entitled "Lyta J. Hayman vs. Compton Sanitarium, Inc., No. SM 5305," Superior Court of the State of California for the County of Los Angeles (hereinafter referred to as the Compton action) and (2) $5,602.78 for legal services rendered in connection with the divorce action entitled "Lyta J. Hayman vs. Max Hayman, No. SM 14554," Superior Court of the State of California for the County of Los Angeles. Max claimed a deduction for legal fees in the amount of $6,223.66 in 1958, which was fully disallowed by respondent. The Compton action was instituted by Lyta to set aside an election of the Board of Directors of the Compton Sanitarium, Inc., in which Max had voted their jointly owned shares. Lyta and Max owned 66 2/3 percent of the outstanding stock of the sanitarium. They were also officers, directors, and salaried employees of said sanitarium. Their motive in litigating was to protect their respective salaried positions at the sanitarium. The primary issue before the California court was the *70 determination as to the authority to vote the stock. This issue turned upon the type of ownership, community property or joint tenancy, in which the shares were held. Opinion Respondent maintains that, since the action involved a question of title, any fees incurred were capital expenditures rather than presently deductible expenditures. Max, on the other hand, contends that even though a question of technical title is involved, the primary issue in litigation is the right to vote the stock and therefore the expenditure is properly deductible from ordinary income as an expense under section 212. We hold that the legal expenses of the Compton action were properly deductible from ordinary income under section 212. The distinction between current expenses and capital expenditures was set forth in the case of Spangler v. Commissioner, 323 F. 2d 913 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. In the Spangler case, the legal fees arose in connection with an action to recover stock which the taxpayer had been fraudulently induced to sell. The Ninth Circuit held that such expenditures were not deductible from ordinary income but were capital expenditures. *71 It was noted at p. 919 that - It is a rule virtually as old as the federal income tax itself that costs incurred in defending or perfecting taxpayer's claim to ownership of capital assets are capital expenditures, and not expenses deductible from ordinary income. * * * The gist of the controversy * * * in the estate court litigation was the ownership of the stock. * * * [Emphasis supplied] By way of a footnote to the above language the Circuit Court stated that - The present case is thus distinguishable from those in which it has been concluded that the primary issue was not ownership, but rather the right to possession * * * [Emphasis supplied] The criterion therefore is the primary issue litigated before the state court. Here the parties litigated primarily the right to vote the stock. Though this question required a determination as to the form of ownership in which the stock was held, there was never any doubt that the shares were owned equally by Lyta and Max. The gist of the controversy, therefore, was the right to enjoy or possess (i.e., vote) rather than the ownership of stock. The language of the Fifth Circuit in the case of *72 Bliss v. Commissioner, 57 F. 2d 984 (C.A. 5, 1932), remanding 20 B.T.A. 35 (1930), which held that the expenses therein were deductible, is pertinent on this point. Therein, it was stated at p. 986 that - The defendants * * * admitted the * * * ownership of the lands in question * * * The defendants in those suits set up claims, not to title * * *, but to rights * * * therein * * * The distinction between ownership and enjoyment or possession of property rights is well settled and prior court decisions which have allowed a deduction for expenses related to the latter dictate a similar result in the present controversy. Campbell v. Fields, 229 F. 2d 197 (C.A. 5, 1956); Allen v. Selig, 200 F. 2d 487 (C.A. 5, 1952); Brown-Forman Distillers Corp. v. United States, 132 F. Supp. 711 (Ct. Cl., 1955); Willy Zietz, 34 T.C. 369 (1960); Frederick E. Rowe, 24 T.C. 382 (1955). We, therefore, are of the opinion that the present case, though involving a question as to the form of ownership, was primarily concerned with the management of the property, that is, the authority to vote the stock. Consequently, *73 the legal expenses of the Compton action are not nondeductible capital expenditures. These expenditures were incurred for the purpose of conserving and maintaining income-producing property. Max's attempt to vote the stock and the defense of his authority to do so were for the sole purpose of preserving his employment and hence his salary. Under these circumstances, it is clear that these expenses are deductible under section 212. Bertha K. Goldberg, 31 T.C. 258 (1958); Frederick E. Rowe, supra. Of the $5,602.78 paid for legal services in connection with the divorce action, Max claimed a deduction in the amount of $4,044.80. The parties have stipulated that of this amount only $750, the amount conceded to be properly allocable to tax advice received by Max in connection with the preparation of the property settlement between the parties, is deductible. Max has abandoned any contention as to the balance. Having held that $2,178.86, the legal expenses of the Compton action, and the parties having stipulated that $750, the expense of tax advice in the divorce action, were properly deductible under section 212, we must now determine whether any portion of *74 these expenses is allocable to Lyta. Both of these debts arose during the marriage and both amounts were paid out of the community account. However, as we had occasion to discuss earlier, in relation to the payment of interest by Max to his attorneys, the payment of these amounts is directly traceable to Max's separate property. Again, as we noted earlier, where separate funds of the taxpayer are used to satisfy an obligation, the debt is not chargeable against the community nor is it deductible as a community expense. Thomasset v. Thomasset, supra.It, therefore, is our opinion that no portion of the legal expenses is allocable to Lyta. (4) Dependency Exemption Findings of Fact Lyta and Max had two minor children, a son and a daughter. Both children resided with their mother in a home owned by both parents as tenants in common. Both parents contributed to the support of the children during the year 1958. For the year in question, Max supplied the following amounts for the support of the children: Support payments pursuant to court or-
der, for both children for the year
$3,600
School supplies for the year
75
Vacations
650
Visits
500
Week ends
250
Gifts
175
Total support allocable to both children
$5,250
Allocable to support of daughter
$2,625
Allocable to support of son
2,625
*75 In addition, Max paid medical expenses for his son in the amount of $75. In total, therefore, Max expended $2,625 for the support of his daughter and $2,700 for the support of his son. Max does not claim any other amounts expended for support in 1958. During the year 1958 Lyta contributed the following amounts for the support of the children: Household items, two-thirds of which were properly
allocable to the children
Total
Children
Taxes on home
$1,800
$1,200
Interest on home
1,800
1,200
Fire Insurance
360
240
Utilities
900
600
Telephone
300
200
Garden & maintenance
960
640
Garden & pool supplies
240
160
Household help
1,800
1,200
Laundry
600
400
$8,760
$5,840
Food allocable one-half to the children
3,600
1,800
Amounts expended solely for the children: Gifts
500
Clothes
600
$8,740
Allocable
Allocable to
to Son
Daughter
$4,370
$4,370
Medical payments
300
Boys' club
600
Camp
180
Singing and ballet fees
600
$5,450
$4,970
Less that amount provided by Max via the support order
1,800
1,800
Net contribution by Lyta
3,650
$3,170
At some time subsequent to 1958, Max reimbursed *76 Lyta for his share of the interest and tax payments on their home. Opinion Both Lyta and Max contend that they are entitled to a dependency exemption for each of the two children. Each takes the position that they, rather than the other, have contributed over one-half of the total support for each child for the year 1958. The determination of who contributed in excess of one-half of the total support is solely one of fact. The only evidence adduced in regard to this matter is the testimony of the respective petitioners which this Court has accepted in both cases at face value except in those instances noted herein. No issue has been raised as to the fair rental value of the home in the year 1958. Because of its joint ownership and because the record does not reveal that Lyta had the sole right to possession of the house, any value given would be considered as supplied equally by each parent. Max's contention that he should receive credit for one-half of the payments of the home's interest and taxes which were made by Lyta is without merit, the fact that he reimbursed such amounts in a later year notwithstanding. Under the statute, section 152(a), the amount must be received *77 during the year from the taxpayer and this Court has held that this language requires more than an unfulfilled duty or obligation on the part of the taxpayer to qualify him for the allowance of the exemption. John L. Donner, Sr., 25 T.C. 1043 (1956), interpreting identical language in section 25(b)(3) of the Internal Revenue Code of 1939. Max, therefore, cannot be credited with any part of these payments. Also, since Lyta testified that the household help lived in during the year, it seems reasonable that the cost of food should be prorated over a household of four rather than three, as Lyta contends. In addition, we note that Lyta's testimony as to the amount of medical expenses for her son in 1958 was ambiguous. She testified at first to $500 but later stated that it was "a few hundred." We have found that an amount of $300 was a reasonable amount in light of the facts before us. We, therefore, hold that Lyta is entitled to an exemption for each of the two children for the year 1958. Issue - Entertainment Expenses, Docket No. 3498-64. Findings of Fact On her return for 1958, Lyta claimed entertainment expenses of $972.63. Respondent, in *78 his statutory notice of deficiency, limited the allowable entertainment expenses to $690.63. Opinion Lyta, on brief, contends that the full amount of the entertainment expenses should be allowed under the doctrine of the case of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). We hold for the respondent. The burden of proof is upon Lyta to show that she is entitled to the deduction claimed. Ernest W. Clemens, supra.This she has failed to do. She has not offered any evidence to support any part of the deduction claimed, and this Court can see no ground on which to determine an amount different than that allowed by the respondent. In fact, from the record before us, it would appear that respondent has already applied the Cohan rule to this situation. Decisions will be entered under Rule 50. Footnotes
1. This amount has been collected by levy in May 1965.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.↩
3. It should be noted that several issues raised by the pleadings for the year 1958 have been either abandoned or conceded by the parties.↩
4. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * *, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
5. SEC. 6501(e)(1)(A). General Rule. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph - * * *
(ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.↩
6. Respondent has urged that for the year 1957 no disclosure is possible because the return itself bore no reference to the omission and even if the affidavit be considered it did not concern itself with 1957. Both of these contentions are without merit since we have found that the affidavit adequately disclosed the omissions for both years and that the affidavit was attached to the 1957 return when it was filed so that it constituted a "statement attached to the return" as prescribed by subsection (ii).↩
7. Sec. 215(a)↩ General Rule. - In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. * * *.
8. Cal. Rev. and Tax. Code: § 18555. Liability of spouses; community income; joint returns. The spouse who controls the disposition of or who receives or spends community income as well as the spouse who is taxable on such income is liable for the payment of the taxes imposed by this part on such income. Where a joint return is filed by a husband and wife, the liability for the tax on the aggregate income is joint and several. * * *↩