KENNETH HELLER and MARIA HELLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Heller v. Commissioner
Docket No. 6545-77.
United States Tax Court
T.C. Memo 1980-417; 1980 Tax Ct. Memo LEXIS 174; 40 T.C.M. (CCH) 1338; T.C.M. (RIA) 80417; September 22, 1980, Filed Patrick J. Murphy, for the petitioners. Vincent R. Barrella, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax and *175 additions to tax under sections 6651(a)(1) and 6653(a), I.R.C. 1954, [1] for the calendar year 1973 in the amounts of $33,627, $1,681.38 and $2,561.85, respectively. The issues for decision are: (1) whether petitioners are entitled to deduct as ordinary and necessary business expense the amount of $36,312 paid to a Brazilian corporation for office rental and related expenses associated with maintaining an office in Brazil and automobile expenses in Brazil; (2) whether petitioners are entitled to deduct as travel expenses or investigatory expenses the amount of $18,666; (3) whether petitioners are entitled to deduct $6,049 as entertainment expenses or investigatory expenses; (4) whether petitioners are entitled to deduct $3,540 for automobile expenses; (5) whether any part of petitioners' underpayment of income taxes is due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a); and (6) whether petitioners are liable for an addition to tax under section 6651(a) *176 for failure to timely file their 1973 Federal income tax return. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Kenneth Heller (petitioner) and Maria Heller, husband and wife, who resided in New York City, New York, at the time of filing their petition in this case, filed their joint Federal income tax return for calendar year 1973 with the Internal Revenue Service Center, Holtsville, New York. The Internal Revenue Service Center in Holtsville, New York, received petitioners' 1973 income tax return on July 15, 1974. Petitioner is a self-employed attorney whose office is located in New York City, New York. Petitioner specializes in international maritime law as a plaintiff's attorney on behalf of businesses, labor unions, and individuals, particularly seamen engaged in international shipping. Petitioner prosecutes claims for wrongful death, personal injuries, and property damage. Mrs. Heller, a native of Brazil, has retained her Brazilian citizenship to the present date. Petitioners were married in New York in May 1968, and since that time Mrs. Heller has resided in New York as a legal resident alien. Prior to 1971 petitioner had *177 never traveled to Brazil. Subsequent to his first trip to Brazil in 1971, petitioner returned to Brazil on a number of occasions. Among petitioner's travels to Brazil were the following trips: Arrival
Departure
12/25/72
1/6/73
3/18/73
3/25/73
7/6/73
7/14/73
12/15/73
unknown
Petitioner spent fewer than eight weeks in Brazil during 1973. In 1972 and 1973 Mrs. Heller traveled to Brazil. A number of Mrs. Heller's trips were made in the company of petitioner; at other times Mrs. Heller traveled to Brazil unaccompanied. During 1973 petitioners additionally traveled to Florida and St. Martin. When petitioner chose not to pay cash for his or Mrs. Heller's airplane tickets to these destinations, including Brazil, he charged the tickets, regardless of the actual carrier, to his Eastern Airlines credit card. On July 19, 1973, and December 5, 1973, petitioner paid these credit card charges by checks in the amounts of $1,605 and $3,000, respectively. During petitioners' visits to Brazil, Mrs. Heller and her contacts introduced petitioner to various persons involved in the shipping industry. In 1972 a prior teacher of Mrs. Heller introduced petitioner to *178 Fernando Frota, owner of the large Brazilian shipping company Frota Oceanica Boa Esperansa (Frota Oceanica). Mrs. Heller introduced petitioner to Jack Baron, co-owner of a Brazilian shipping company in Belem, Brazil. Thereafter Mr. Baron presented petitioner to Walter Gainsbury, chief executive officer of Companhia de Navegacio Maritima, netumar (Netumar). In 1973 Netumar provided petitioner office accommodations in its headquarters. Netumar supplied petitioner with a room, telephones, Telex, a chauffeured automobile, trilingual secretary, and photocopying facilities. These accommodations, including the car, were available to Mrs. Heller when petitioner did not accompany her to Brazil. When neither of petitioners was in Brazil, Netumar made available these office accommodations to persons of its choosing. On December 10, 1973, Netumar submitted a bill to petitioner for $36,312 for the above accommodations, which petitioner paid on December 15, 1973. [2]
*179 In May 1972 the United States ambassador signed a treaty which recognized Brazil's claim of exclusive rights to fish the waters within 200 miles of Brazil's coastline. Petitioner thought that the treaty would permit fishing for crustaceans within the 200-mile limit only by Brazilian flagships, and he perceived that a Brazilian fishing right would be a potentially valuable resource. Petitioner determined that the Brazilian government would issue fishing rights only to citizens of Brazil born in that country. As a result petitioner decided to ascertain whether Mrs. Heller could acquire fishing rights in her name. On behalf of Mrs. Heller, petitioner prepared an application for acquisition of the Brazilian fishing rights. The application was submitted in 1972 to the appropriate government authority, the Superintendent Desenvelementio da Pescadao (SUDEPE), in the names of Mrs. Heller and Garcia Pescar Limitada (Ltda.), a limited partnership. In addition to Mrs. Heller, the partners in Ltda. were Alphonso Garcia, Mrs. Heller's brother, and Joanna Antonia Garcia, Mrs. Heller's aunt. To expedite the application process, petitioner appeared in such cities as rio de Janeiro, Brasilia, *180 and Belem before officials of SUDEPE on numerous occasions, including the first week of January 1973, March 20, 21, and 22, 1973, and in July 1973. Concurrent with the filing of the application petitioner commenced planning for the construction of fishing boats ultimately to be used by Ltda in the event that the fishing license were granted. Petitioner determined that construction of the fishing vessels in the United States would be too costly. Instead he decided that the boats could be built more cheaply in Brazil using export financing available through Carteira de Comercio Exterior (CACEX), a branch of the Brazilian government bank, Banco do Brasil. Because petitioner determined that the potential CACEX export financing would be available only to a foreign company, he formed on January 19, 1973, a Panamanian corporation, Compania Pilar Navegacion (Pilar), for the purpose of applying for and obtaining the CACEX construction loan commitment. Petitioner was the sole shareholder of Pilar and personal guarantor of the company debts. Petitioner planned for Pilar to use the financing to purchase fishing vessels for charter to Ltda. By letter dated July 25, 1973, the Banco do *181 Brasil informed petitioner-- that our bank will extend to the above-mentioned company a loan of two hundred and fifty thousand dollars ($250.000) provided we are presented the one of the following guaranties: 1) A bank guaranty from any one of our correspondent bank in New York. 2) The guaranty of one of our clients in Brazil, provided that company has $250.000 available in its line. In an effort to obtain such a guaranty, petitioner conducted a meeting prior to March 27, 1973, with a Brazilian bank, Banco Safra. Petitioner also approached the New York branch of the Banco do Brasil. In return for the latter bank's guaranty he offered the bank both a mortgage on the vessels to be built and a personal guaranty. Thereafter, petitioner approached Chemical International Finance, a subsidiary of Chemical Bank, with regard to obtaining the guaranty required by CACEX. By the end of summer 1973 Chemical International Finance informed petitioner that it would pledge the required quaranty. Pilar received as its sole asset the CACEX financing commitment. At the same time that petitioner commenced arrangements for the financing, he approached naval architects with a proposal for *182 their designing the fishing vessels necessary to the project. In his own name petitioner contracted with Southern Marine Corporations, an American firm of naval architects, to design the boats. Petitioner personally paid Southern Marine Corporation for its services. In March or April 1973 Mr. Baron introduced petitioner to an officer of Industria e Comercio Naval, S.A. (INCONAV), a shipbuilding company. Petitioner discussed with officials of INCONAV the possibility of the company's constructing 10 fishing vessels for Pilar. In a letter dated April 18, 1973, INCONAV detailed its proposal. On July 12, 1973, INCONAV and petitioner, as agent for Pilar, executed a contract for the construction of 10 refrigerated fishing vessels at a total cost of $1,450,000. Mrs. Heller spent a portion of her time when in Brazil in pursuit of obtaining the fishing license from SUDEPE. Approximately 1-1/2 to 2 years after the submission of the initial application, even though no fishing vessels had been constructed, SUDEPE issued the fishing license to Ltda. During 1973 petitioner and Mr. Gainsbury of Netumar discussed a venture for Netumar's "jumboizing" its fleet. Through the "jumboizing" *183 process Netumar's existing vessels would be enlarged in size and capacity by adding a large mid-body steel section to each boat without a substantial increase in Netumar's operating costs. Pursuing this venture petitioner contacted several naval architects and shipbuilders. In 1974 petitioner proposed that Netumar seek financing through the Export-import Bank of the United States. However, the necessary financing for the venture was not obtained, and the venture terminated. Netumar never paid petitioner for his work in the venture. During 1973 on behalf of Frota Oceanica petitioner contacted various American companies to arrange for its purchase of coal. During the year petitioner traveled to West Virginia and secured a contract with a West Virginia Mining company under which coal would be transported in drums to Frota Oceanica in Brazil. Frota Oceanica never paid petitioner for his work in arranging the coal deal. Between the time of petitioner's first trip to Brazil and trial, he never attempted to acquire a license to practice law in Brazil. In the year in issue petitioner was admitted to practice law only in New York. In 1973 petitioner litigated three or four cases *184 in the New York courts. The duration of each case was approximately two to three weeks. Petitioner arranged with his clients for payment on a contingency fee basis. In 1973 petitioner had approximately 50 active cases in his New York maritime law practice. He investigated these cases himself with the assistance of Captain William Ash, a New York City resident. When investigating these cases in 1973 petitioner traveled several times weekly to such New Jersey ports as Hoboken, Leonardo, Elizabeth, and Newark. At each of these ports petitioner would approach longshore gang bosses, who were hired by the stevedore companies to supervise the working longshoremen, and he would request an interview with specific longshoremen who might have been involved in or observed occurrences relating to a particular case. At times petitioner would ask the longshore gang boss to show him where an accident happened. Petitioner would pay in cash the longshore gang bosses to allow him to interview the longshoremen during their work hours. This method of arranging interviews would relieve petitioner of the necessity of locating the particular longshoremen after their work hours. Petitioner also *185 gave cash to Captain Ash, who was a maritime expert, to use in connection with his investigation of the place of the accident. Petitioner sometimes charged to his clients the cash advanced to Captain Ash and at other times did not. He never charged the cash he paid to longshore gang bosses to his clients since he viewed these amounts as the cost of conserving his own time in preparing a case. During 1973 petitioner's books and records were maintained by his secretaries in the ordinary course of their duties. Petitioner did not become involved in the recordkeeping because he did not feel that he was sufficiently capable. Petitioner totally relied on his secretaries to keep his financial records. Petitioner did not know to what extent his clients were charged for his travel expenses in 1973. In 1977 petitioner began working on several maritime law cases to which he was assigned by Mr. Bruno Cappellini, the Public Administrator of the County of New York and a friend of petitioner. In this capacity, Mr. Cappellini engaged attorneys to represent the Public Administrator on behalf of individuals and estates involved in legal matters. Mr. Cappellini chose petitioner to represent *186 the Public Administrator in legal actions which resulted from a sea accident involving the M.S. Sylvia L. Ossa, a Panamanian flagship, during its 1976 voyage between Brazil and Philadelphia. One of the defendants in these actions was Frota Oceanica Brasileira, S.A., and another was Mr. Fernando Frota. The suits in these cases were filed in the Supreme Court of New York under the Jones Act. Petitioner was also appointed to represent the Public Administrator in wrongful death actions caused by a November 14, 1971, accident in Montevideo, Uruguay, between two helicopters. Petitioner began his work on these cases in 1978. In 1973 an accounting firm prepared petitioners' Federal income tax return. In a letter dated April 15, 1974, petitioners requested a 90-day extension of time for filing their 1973 income tax return. Petitioner cited as the reason for the extension request his absence from the country "for the most part of this year, and [I] was therefore unable to supply my accountant with the necessary information in order to have my tax returns prepared on time." On July 11, 1974, petitioners signed their 1973 joint Federal income tax return, which was received by the Internal *187 Revenue Service on July 15, 1974. In August 1977 some of the documents and records used in calculating petitioners' 1973 income taxes were in the possession of petitioners' attorney. Petitioners' attorney left the records in his automobile overnight on the streets of New York City, and the attorney's automobile and contents thereof were stolen. In their 1973 income tax return petitioners claimed deductions for Brazilian office expenses, and expenditures for travel, entertainment, and automobile, in the amounts of $36,312, $18,666, $6,049, and $3,540, respectively. In disallowing these claimed deductions, respondent stated in his statutory notice of deficiency: You did not establish that the disallowed portions of the claimed deductions qualified as ordinary and necessary business expense, or that expenditures were made for the purposes designated. Additionally, respondent determined a 5 percent addition to tax under section 6653(a) since-- it is determined that part of the underpayment of tax for the taxable year ended December 31, 1973, is due to negligence or intentional disregard of rules and regulations * * *. Respondent also determined a 5 percent addition to *188 tax provided by section 6651(a) for petitioners' failure to timely file their income tax return. OPINION Section 162(a) provides in part as follows: (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses * * * while away from home in the pursuit of a trade or business; and (3) rentals * * *. Where expenditures for entertainment and travel away from home are directly connected with the active conduct of a taxpayer's trade or business and would qualify for deduction under section 162, the deduction is not allowable unless the taxpayer complies with section 274 substantiation requirements. The Supreme Court in Welch v. Helvering,290 U.S. 111, 113 (1933), gave meaning to "ordinary and necessary expenses" as the terminology *189 was used in the predecessor provision to section 162(a). The Court indicated that "necessary" means "appropriate and helpful" in "the development of petitioner's business." In Deputy v. duPont,308 U.S. 488, 495 (1940)the Supreme Court stated that-- Ordinary has the connotation of normal, usual, or customary. To be sure, an expense may be ordinary though it happen but once in the taxpayer's lifetime. * * * Yet the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved. Whether an expenditure is "ordinary and necessary" is a factual determination. Commissioner v. Heininger,320 U.S. 467 (1943). The first issue is whether petitioners are entitled in 1973 to an ordinary and necessary business expense deduction for payment of $36,312 to the Brazilian corporation, Netumar, for expenses associated with petitioners' maintaining a Brazil office and for use of an automobile in Brazil. Respondent does not dispute that petitioner paid $36,312 to Netumar in 1973. However, respondent argues that this *190 expenditure was not incurred in carrying on petitioner's existing trade or business. Rather, respondent asserts that the $36,312 constitutes a pre-operating or capital expenditure. On the other hand, petitioners contend that the Brazilian office expenditure was incurred in carrying on petitioner's existing practice of law in New York. Petitioner asserts that the Brazilian office was necessary to establish an appropriate appearance that would enable him to attract Brazilian shipping companies as new clients for his New York maritime law practice. After review of the facts and circumstances of this case, we conclude that the use of the office and automobile by petitioner and his wife in 1973 was in part personal and in part in connection with obtaining a Brazilian fishing license. Therefore none of the $36,312 is properly deductible as an ordinary and necessary business expense. Petitioner testified that in anticipation of expanding his law practice to include maritime cases which might flow from Brazilian shipping operations, he was introduced to and worked with a number of officials from various Brazilian shipping companies. However, the record does not indicate that any of *191 these meetings occurred at petitioner's Brazilian office. Nor does the record show that at the Brazilian office petitioner performed tasks that either were directed toward attracting Brazilian clients or succeeded in attracting that clientele. It appears that the Brazilian office was used by petitioners primarily as a workplace to establish several new business ventures. The major venture was the formation of the Pilar-Ltda. fishing venture and the work toward obtaining a fishing license for Ltda. The record indicates that petitioner also did some work in development of a plan to "jumboize" Netumar's fishing fleet and in arranging for coal purchases for Frota Oceanica. From the evidence we conclude that none of these ventures were connected with petitioner's law practice. Petitioner might have regarded the Pilar-Ltda. venture as a potential source of legal fees in future years. If he did, he certainly could not realistically expect any legal work from Pilar-Ltda. until the fishing operations had begun and perhaps become profitable. Anticipation of legal fees from a profitable investment *192 does not turn that investment into a business expense. The record indicates that petitioner expected Ltda. to be a profitable business and from these profits to obtain a return on his investment made in his wife's name. At the time of the trial of this case, Ltda still had the fishing license, and, so far as this record shows, petitioners had not abandoned the venture. In the future, the venture may become profitable. In any event, as of the year here in issue petitioners were still actively working to develop the venture. Amounts paid to develop a new business are capital expenditures. Frank v. Commissioner, 20 T.C. 511 (1953). There are cases dealing with the right of a taxpayer to deduct a loss from a loan to or investment in a business other than his primary occupation where the claim is made that the loan or investment was for the purpose of furthering his primary business. See Tulane Hardwood Lumber Co. v. Commissioner, 24 T.C. 1146 (1955); Snow v. Commissioner, 31 T.C. 585 (1958); Electrical Fittings Corp. v. Commissioner, 33 T.C. 1026 (1960); *193 Pepper v. Commissioner,36 T.C. 886 (1961). However, in all those cases the taxpayer had shown the worthlessness of the loan or investment. The question in those cases was whether the loss was an ordinary loss or a capital loss. Petitioners in the instant case have made no claim of a loss in 1973 from their investment in the venture in South America. Clearly, no portion of the office and other expenses in Brazil are deductible in 1973 as a loss from a transaction entered into to enhance petitioner's receipts from the practice of law. The venture was still viable in 1973. To the extent that the expenses in Brazil were not for developing a new business, they appear to be primarily personal. Mrs. Heller's relatives and friends were in Brazil, and petitioners visited with them. Petitioners claimed that petitioner obtained the cases from the Public Administrator because of travels to and expenses incurred in Brazil. However, the record does not support this claim. In fact, one of the persons petitioners refer to as a possible source of work from Brazil was a defendant in the cases petitioner received from the Public Administrator. On the basis of this record *194 we conclude that the major portion of the $36,312 is a nondeductible capital expenditure, and the balance, such as Mrs. Heller's use of the office and the automobile to the extent it was not in pursuit of the obtaining of the fishing license, has not been shown to be other than personal. The second and third issues are whether the amounts claimed by petitioners to be deductible in 1973 as travel and entertainment expenses constitute ordinary and necessary business expenses under section 162, and, if so, whether these items have been substantiated as required by section 274. Petitioner testified that the $18,666 claimed deductions for travel expenses were for airplane fares and costs of hotels and meals incurred in his practice of law in New York. At one point he stated that a part of the claimed deductions for travel expenses might have been for payments that he made to longshoremen. However, the major portion of the testimony tends to relate this claimed expenditure to the deduction claimed for entertainment. Aside from showing that he and Mrs. Heller traveled to Brazil several times in 1973, petitioner did not show the places to which he traveled on business, the clients for *195 whom he traveled, the dates of the trips, the amounts expended at each location, or the purpose of each expenditure. Petitioner did testify that in 1973 he vacationed on St. Martin and in Florida. Petitioners produced two checks, payable to Eastern Airlines in 1973, aggregating $4,605. Petitioner testified that he would charge all air tickets not paid in cash to his Eastern Airlines credit card and subsequently would pay the charges by check. Petitioner also testified that some of Mrs. Heller's trips to Brazil were charged on that credit card.
Pursuant to section 1.162-2(b) and (c), Income Tax Regs., travel expenses are deductible-- (b)(1) * * * only if the trip is related primarily to the taxpayer's trade or business. * * * (2) Whether a trip is related primarily to the taxpayer's trade or business or is primarily personal in nature depends on the facts and circumstances in each case. * * * (c) Where a taxpayer's wife accompanies him on a business trip, expenses attributable to her travel are not deductible unless it can be adequately shown that the wife's presence on the trip *196 has a bona fide business purpose. * * * As we determined above, petitioner's primary efforts in Brazil were not in pursuit of his New York law practice. Instead, petitioners concentrated on establishing new business ventures and visiting with Mrs. Heller's family. Because the trips to Brazil were not related primarily to petitioner's existing trade or business, to the extent the claimed $18,666 travel expenses are related to trips to Brazil they are not deductible as ordinary and necessary business expenses. To the extent the travel expenses were for travel other than to Brazil, petitioners have failed completely to comply with the requirements of section 274 of substantiation of such expenses. At trial petitioner testified that either all or a portion of the $6,049 claimed to be deductible as entertainment expenses consisted of cash paid to longshore gang bosses or for meals for witnesses. The purpose of the cash payments to longshore gang bosses was to persuade them to arrange for petitioner or Captain Ash during work hours to interview the longshoremen who might have witnessed occurrences which gave rise to some of petitioner's maritime cases or to show petitioner or Capitain *197 Ash the scene of an accident. In light of the nature of the practice of maritime law, we do not doubt that petitioner made some cash payments to the longshore gang bosses for the purposes he stated and that he advanced cash to Captain Ash to use for this purpose. Respondent contends that the amounts paid by petitioner to longshore gang bosses and for meals for witnesses were gifts or entertainment and that section 274(d) requires that expenditures for gifts and entertainment be substantiated by adequate records or sufficient corroborating evidence. To meet the adequate records requirement of section 274(d), the regulations must be followed. Sanford v. Commissioner, 50 T.C. 823 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969). Section 1.274-5(b)(3), Income Tax Regs., requires that the substantiation include adequate records or other sufficient evidence indicating the amount, time, place, business relationship, and business purpose of the claimed expenses.The record contains no such detailed information with respect to any portion *198 of the $6,049. Section 274(d) prohibits allowing a gift or entertainment expense deduction based on estimated expenditures. H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 427; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 741; Sanford v.Commissioner, supra.In our view any amount spent by petitioner for meals for witnesses, if not charged to clients, would come within the substantiation requirement of section 274(d). However, amounts of cash given by petitioner to Captain Ash to facilitate his investigation of an accident to the extent not charged to clients would not constitute gifts covered by section 274(d). Also, a payment by petitioner to longshore gang bosses for assisting petitioner in investigating the scene of an accident or in arranging for petitioner to interview several longshoremen at one time would not constitute a gift within the meaning of section 274(d). These payments are more in the nature of payments for assistance in investigating a case. Petitioner was able to save his own time by paying for this assistance. On the basis of this record it is difficult to estimate *199 the portion of the $6,049 which was spent for assistance in investigating cases and the part spent for meals for witnesses. Petitioner's estimate of $200 a week for paying for assistance in investigating cases for the weeks he was in New York is obviously higher than the total $6,049 deduction claimed. Using our best judgment, we conclude that petitioner spent $5,000 in 1973 for assistance in investigating cases. Cohan v.Commissioner, 39 F.2d 540 (2d Cir. 1930), affg. 11 B.T.A. 743 (1928). We therefore hold that $5,000 of the claimed $6,049 for "entertainment" expense is properly deductible, and the balance is not deductible because of petitioner's failure to meet the requirements of section 274(d). The third issue is whether petitioners are entitled to deduct any portion of a claimed $3,540 automobile expense. Section 162 permits a deduction for expenses incurred in the operation of an automobile used in the furtherance of a taxpayer's trade or business. Where a taxpayer fails to maintain detailed records of the transportation costs associated *200 with his business, approximations based upon collateral evidence and secondary sources may be used to determine the appropriate deduction. Section 1.162-17(d), Income Tax Regs.; Cohan v. Commissioner, supra.
Petitioner testified that in 1973 he traveled several times weekly from New York to such New Jersey ports as Hoboken, Leonardo, Elizabeth, and Newark to interview longshoremen in connection with his investigations of pending maritime cases. Petitioner estimated that he drove approximately 60 miles round trip from his New York office to Elizabeth and Newark, New Jersey, approximately three to five times weekly. Petitioner testified that occasionally he drove to Leonardo, New Jersey, which he considered to be a trip of approximately 40 to 50 miles from his New York office. Petitioner estimated that these business travels resulted in approximately 200 to 300 miles of driving in his automobile weekly. While petitioner did not provide a diary or detailed record of his drives from New York to the various port cities, we rely upon the Cohan rule and estimate that in 1973 petitioner drove approximately 200 miles during a normal *201 week of investigation. Since petitioner was in Brazil and Florida a total of approximately 8 to 9 weeks in 1973 and was engaged in trials in New York for another 8 to 12 weeks, we conclude that petitioner traveled approximately 6,500 miles in 1973 in the ordinary course of his business as a maritime lawyer. Therefore, petitioner is entitled to a deduction for the cost of operating his automobile in carrying on his law practice as based upon the standard mileage rate in effect in the tax year in issue. See Rev. Proc. 70-25, 1970-2 C.B. 506. Petitioner testified that he spent approximately $1 on tolls on the days he drove to New Jersey ports. We conclude from our determination of the weeks during which petitioner made trips to New Jersey that, in addition to the deduction for use of his personal automobile, petitioner is entitled to deduct $100 for payment of tolls on business trips in 1973. The fourth issue is whether any part of petitioners' underpayment of income taxes was due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). *202 Section 6653(a) provides: (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.--If any part of any underpayment underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. Respondent takes the position that the deficiency in income tax paid for 1973 was in part attributable to a failure on the part of petitioners to maintain adequate books and records. Respondent states that "It is a well established principle that where the understatement of the tax due is a result of lax bookkeeping methods, the negligence penalty may properly be asserted." The 5 percent addition to tax may be imposed if a taxpayer has failed to maintain accurate or adequate records or ledgers from which the proper income and deductions are determinable. Zivnuska v. Commissioner, 33 T.C. 226, 240 (1959). *203 Respondent's determination in the notice of deficiency that a portion of an underpayment of tax is due to negligence or intentional disregard of rules and regulations raises the presumption of correctness and imposes upon the taxpayer the burden of proving that the imposition of an addition to tax under section 6653(a) is erroneous. Courtney v.Commissioner, 28 T.C. 658, 669 (1957). At trial petitioner admitted that he is not a capable bookkeeper and hired secretaries with bookkeeping skills to maintain accurate and proper records. A taxpayer, however, cannot avoid the duty of filing accurate tax returns by foisting that responsibility onto an agent. Bailey v. Commissioner, 21 T.C. 678, 687 (1954). This record totally fails to show what underlying records of travel or entertainment expenses petitioner supplied to his bookkeeper. A taxpayer who makes no effort to prevent errors in bookkeeping is negligent within the meaning of section 6653(a). Leroy Jewelry Company v.Commissioner, 36 T.C. 443, 445-446 (1961). At trial petitioner *204 admitted that he was unaware of the treatment certain disbursements received for bookkeeping purposes since he relied upon his secretaries-bookkeepers to properly maintain his records. Petitioner gave the impression that he did not supervise his secretaries in their bookkeeping tasks. In response to respondent's assertion that petitioners failed to maintain adequate records, petitioners take the position that the materials needed to substantiate their claimed deductions were stolen from their attorney's automobile in August 1977. We note that petitioner's records were apparently lost by theft after receipt of respondent's statutory notice of deficiency and that petitioners made no attempt to reconstruct the lost records. As a result of petitioners' failure to duplicate their lost records and petitioner's delegation of the recordkeeping task to his secretaries-bookkeepers, we conclude that petitioners were negligent within the meaning of section 6653(a). The final issue for decision is whether petitioners are liable for an addition to tax under section 6651(a) for failure to timely file their 1973 income tax return. *205 Section 6651(a)(1) provides that failure to timely file a Federal income tax return results in the application of an addition to the tax of the dilatory taxpayer of 5 percent per month up to a maximum of 25 percent unless the taxpayer proves the failure is "due to reasonable cause and not due to willful neglect." [3]
*206 Petitioners take the position that their failure to timely file their tax return was due to reasonable cause rather than willful neglect. The question of whether petitioners' failure resulted from "reasonable cause" is a question of fact, and the burden of proof is upon petitioners. Shomaker v. Commissioner, 38 T.C. 192, 202 (1962); Latham Park Manor, Inc. v. Commissioner, 69 T.C. 199, 219 (1977), affd. in an unpublished opinion, 618 F.2d 100 (4th Cir. 1980). In a letter dated April 15, 1974, petitioner requested a 90-day extension for filing petitioners' calendar year 1973 income tax return. In the letter petitioner stated that the request was based upon his absence from the country for most of 1973 and that this absence prohibited his supplying the necessary information for the preparation of his tax return to his accountant. On May 6, 1974, the Internal Revenue Service granted a 60-day extension. The Internal Revenue Service received petitioner's 1973 income tax return on July 15, 1974. Petitioners argue that if their request for a 90-day extension had been granted, their 1973 tax return would have been filed timely. On *207 brief, petitioners remark that "Unbeknownst to Mr. Heller, however, his timely request for a ninety (90) day extension had been altered by the Internal Revenue Service to a sixty (60) day request." The record is clear that even though petitioner requested a 90-day extension, respondent granted a 60-day extension to petitioners for filing their tax return. The obligation falls on petitioners to determine the correct due date of their return. The duty of timely filing a tax return is the personal duty of a taxpayer, and the taxpayer cannot excuse himself from the proper performance of that duty by claiming to be unaware of the correct due date. Groves v. Commissioner, 38 B.T.A. 727, 738 (1938); Sabatini v. Commissioner, 98 F.2d 753 (2d Cir. 1938), affg. 32 B.T.A. 705 (1935). Petitioners' failure to timely file their 1973 income tax return did not result from reasonable cause and we therefore sustain respondent's determination of an addition to tax under section 6651(a). Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the year in issue.↩
2. The bill submitted by Netumar to petitioner is as follows: ↩
OFFICE RENTAL
US$ 9,600.00
TELEPHONE
US$ 1,210.00
TELEX
US$ 6,028.00
TRANSPORTATION, AUTOMOBILE
AND CHAUFFEUR
US$ 5,773.00
INTERPRETER
US$ 2,511.00
OFFICIAL TRANSLATIONS, PHOTOSTATS
SECRETARY, OFFICE BOY, CLEANING,
MISCELLANEOUS
$10US,054.00
UTILITIES, ELECTRICITY
US$ 1,136.00
TOTAL
$36,312.00
3. Sec. 6651(a)(1) provides: (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;↩