OPINION. B,ioe, Judge: The principal issue to be determined is whether the petitioners realized ordinary income or capital gains[1] from the sale of undivided interests in two Texas oil and gas leases. The “interest of a lessee in oil and gas constitutes an interest in ‘real property.’ * * * [And] if such interests were held for more than six months, except with respect to a dealer therein, they will, qualify as ‘property used in the trade or business,’ as defined by section 117 (j) of the Code, and they are subject to the treatment provided by that section.” I. T. 3693,1944 C. B. 272. It is respondent’s contention that Bailey became a dealer in leases and made these sales in the “course of his trade or business,” thus realizing ordinary income. Numerous tests have been employed to aid in the determination of whether property has been held by a taxpayer “primarily for sale to customers in the ordinary course of his trade or business.” The factor which must be given greatest weight is the purpose for which the property was held during the period in question. Walter R. Crabtree, 20 T. C. 841; Carl Marks & Co., 12 T. C. 1196 (1949). This purpose must be determined from the evidence as to the intention of the taxpayer at the time of acquisition and his conduct during the holding period. The record shows that the 1,310-acre Callahan County lease was acquired for the purpose of exploitation of its oil and gas resources. It appears that the trust owned an undivided 600 acres of the lease and that the balance was retained by the original four associates. They had hopes of becoming wealthy oil producers with the technical skill of Stebinger, the financing efforts of Bailey, and the funds for drilling an initial well provided by the trust. Although the first well proved to be a failure, Bailey and Stebinger still retained faith in the oil-bearing propertied of their lease. Their two associates, Wallace and A1 Stebinger, were bought out; and they decided to proceed with the development. The only way in which Bailey could raise funds for the drilling of a second well was by the sale of part of his undivided interest in the lease. Unfortunately, the second well was also a failure ; and the process' had to be repeated for the financing of a third and fourth well, both of which were also unsuccessful. But it is significant that Bailey at all times tried to retain as great an interest in the lease as possible. Of course, since it was impossible to know in advance what the cost of drilling a well would be, Bailey found it necessary to raise more than the amounts actually spent in this manner. He was compelled to do this because it would be uneconomical to stop operations while raising additional capital. Bailey was also forced to make additional sales in order to help support himself and his family. He was risking everything on the successful completion of the wells; and rather than abandon the lease and lose everything that he had already put in, he gave up his business in order to devote his entire time to the raising of the necessary funds for the drilling of a “successful” well. Although Bailey gave up his business in 1946 in order to devote his entire time to raising money for these oil ventures, he did not thereby become a dealer in leases. He was an oil operator trying to induce others to invest capital in the lease which he hoped would make him, and them, wealthy individuals. The record shows that the Eastland lease was acquired for the same purpose as the Callahan lease, and that sales of interests in it were made in the same manner and for the same purpose as in the Callahan tract. However, we may dismiss from our consideration the issue as to whether the proceeds of the sale of interests in the Eastland County lease amounting to $88,500 are entitled to the favorable treatment afforded by section 117 since it does not appear that this lease was held for the required 6 months before these particular sales were made. This lease was acquired in October 1947, and a well was completed thereon on February 16, 1948, with $83,500 acquired by the sale of interests in that particular lease. Although a part of the $83,500 in interests sold in that lease may have been sold after the required 6-month holding period, and may have been used to finance the drilling of a second well on the Eastland County lease, petitioner has failed to introduce any evidence to this effect. It, therefore, follows that the $83,500 resulted in ordinary income. The respondent argues that the frequency and continuity of sales indicates that they were made in the course of business. Snell v. Commissioner, 97 F. 2d 891 (C. A. 5, 1938). However, the sale of interests was not a continuous process. When additional funds were required for the drilling of a new well, Bailey would sell part of his remaining interest in the lease. Although sales may have been frequent at these periods when new capital was required, he would discontinue his fund-raising activities while the Well was being drilled. The record shows that it was a general practice to turn down would-be purchasers when it was believed that sufficient funds had been raised for the drilling of the particular well being financed. Bailey sold no interests in leases in which the production of oil was not the immediate objective. He and his associates held several leases which they never developed, but they sold no interests in these leases. Nor were sales made to hedge or minimize the risk. It is clear that the dominant motives for such sales were the need for new capital for development costs and for current living expenses. Any gains realized on the sale of portions of their investment merit capital gains treatment under section 117. Petitioners argue that the proceeds of the various sales must be considered contributions to capital to the extent that they were actually used in the development of the wells. They cite our decisions in Rawco, Inc., Ltd., 37 B. T. A. 128 (1938), and Transcalifornia Oil Co., Ltd., 37 B. T. A. 119 (1938). These cases are not in point. In each, the drilling of specific wells was financed by the sale of production certificates entitling purchasers to percentage interests in proceeds to be derived from the wells’ production. Vital to the decision in each case is the finding that the seller was required, by the terms of the sale, to use the proceeds of the sale in the development of the well whose future production was being assigned. 3STo evidence of any sucli agreement has been brought to our attention in the instant case. Although it may have been implicit in the various selling arrangements that a well was to be developed by Bailey and Stebinger, we have no basis for assuming that the proceeds of the various sales were required to be earmarked for that purpose rather than being at the unconditional disposal of the sellers. Petitioners now contend that a portion of the gain from the sales of interests in the Callahan County lease is allocable to Stebinger, even though they had included the entire amount as their own on their 1946 and 1947 tax returns. No assignment of error is made in the petitions as to the proportion of the gain from these sales properly allocable to the petitioners. We, therefore, hold that the entire gain from the sale of these interests is taxable to the petitioners. They also contend that any income earned or capital gain realized on the sale of interests in the Callahan County lease in 1946 and 1947 and the Eastland County lease in 1948 are not taxable to them according to their distributive share on the theory that both the Callahan and Eastland arrangements were, in reality, associations taxable as corporations. Having failed to raise these issues in their petitions, they cannot now be considered. Petitioners have not shown that failure to file timely returns for 1946 and 1947 was due to reasonable cause and not to willful neglect. The respondent’s assessment of a 25 per cent delinquency penalty under section 291 (a) is, therefore, sustained. Petitioners have failed to offer any explanation for the stipulated understatement of their income in their 1946 and 1947 returns, by $7,337.40 and $7,165.46, respectively. Respondent’s determination of 5 per cent negligence penalties under section 293 (a) must, therefore, be upheld. The negligence penalty for 1948 must be sustained. The duty of filing accurate returns cannot be avoided by placing responsibility upon an agent. The fact that petitioner told the person who made up the partnership return about the sale of leasehold interests totaling $83,500 cannot excuse his failure to read the return and ascertain the inclusion of this item. Milton A. Mackay, 11 B. T. A. 569 (1928). There is no evidence that this amount was omitted due to an honest misunderstanding of the law. There remains one last item, amounting to $6,212.29, which petitioners deducted as prospecting and drilling expense in their return for 1946. Respondent determined that this was for the purchase of casing which should have been capitalized. Petitioners offered no evidence with respect to this adjustment, and did not argue it on brief. We, therefore, deem the allegation of error in the petition with respect to this item to have been abandoned. Decisions will be entered under Buie 50. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. — As used in this chapter— (1) Capital assets. — The term “capital assets” means property held by the taxpayer (whether or-not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer; (j) Gains and Losses Prom Involuntary Conversion and Prom the Sale or Exchange of Certain Property Used in the Trade or Business.— (1) Definition of property used in the trade or business. — Por the purposes of this subsection, the term “property used in the trade or business” means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Such term also includes timber with respect to which subsection (k) (1) or (2) is applicable.