**Ellis CAMPBELL, Jr., District Director of Internal Revenue, Appellant,**

v.

**Bert FIELDS and Alyne Fields, Appellees.**

**No. 15686.**

United States Court of Appeals
Fifth Circuit.

Jan. 27, 1956.

Elmer J. Kelsey, Atty., Dept. of Justice, Washington, D. C., H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to the Atty. Gen., John C. Ford, Asst. U. S. Atty., Dallas, Tex., for appellant.

Robert J. Hobby, Wentworth T. Durant, Earle B. Mayfield, Jr., Dallas, Tex., Mayfield & Durant, Dallas, Tex., for appellees.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

JONES, Circuit Judge.

The appellees, herein called the taxpayers, were lessees, prior to 1948, of 86 oil and gas leases in the Waskom Field, Harrison and Panola Counties, Texas. There were producing gas wells on these leases or some of them.

By an amendment to its Constitution made in 1917, the State of Texas declared that the conservation and development of the natural resources of the State were public rights and duties, and directed the Legislature to pass all such laws as may be appropriate thereto. Tex. Const. Art. 16, § 59, Vernon's Ann.St. Pursuant to this directive the Texas Legislature has enacted comprehensive regulatory measures. Administration is placed in the Railroad Commission of Texas. Vernon's Tex.Civ.Stat.Ann. Title 102, § 6004 et seq; Railroad Commission of Texas v. Rowan & Nichols Oil Co., 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368.

■ On April 16, 1947, the Railroad Commission of the State of Texas issued an order regulating production of oil and gas in the producing zones in the Waskon Field where taxpayers' leases were located. The drilling of new wells was restricted. Proration units of a standard area of 640 acres, with a ten per cent. tolerance area, were authorized. We need not here discuss the details of the Texas law relating to pooling and unitization. See 31 A Tex.Jur. 641, Oil and Gas, § 382, et seq. But a better understanding of the problem might be had by a consideration of the meaning of the terms "pooling" and "unitization". For this we turn to an article by Dean A. Allen King of the University of Tulsa, where it is said:

"In recent years two terms have become rather firmly established in the nomenclature of the oil and gas industry, 'pooling' and 'unitization'. Both refer to methods of achieving cooperative development, to a degree, of oil and gas properties, and while to the uninitiated they may seem to be synonymous such is not the case and it is important to distinguish them carefully. The term 'pooling' is used, and will be so used throughout this paper, to refer to the bringing together of two or more small or irregularly shaped tracts of land to form a drill site in connection with a program of uniform well spacing. The arrangement is essentially a species of joint venture whereby the various owners of the tracts pooled join to drill a well and to share in the benefits to be expected. It may be a pooling of either the working interests alone, or both the working interests and royalty interests. In the former, it is probable that compensatory or offset royalty may have to be paid to the owners of royalty under the tracts not drilled, hence, the latter is the preferred form. The drill site formed is sometimes referred to as a drilling unit; thus, confusion is introduced as statutes requiring pooling are often referred to as 'unitization' statutes. This is the case with the so-called compulsory unitization statute of Louisiana.

■ " 'Unitization' or 'unit operation,' as distinguished from 'pooling', represents development and operation of an oil pool as a unit. It involves the consolidation or merger of all of the interests in the pool and designation of one or more of the parties as operator. Here the combining of all of the overlying tracts into a single unit has nothing to do with establishing a given drill site, but it does facilitate proper spacing as all surface lines are ignored. Obviously,

this method of development will permit the location of wells on the structure so as to secure the most scientific use of the natural reservoir energy in the production of oil and gas by primary recovery methods." King, Pooling and Unitization of Oil and Gas Leases, (1948) 46 Mich.L.Rev. 311, 312.

The taxpayers' leases did not cover a sufficient area to permit them to put all of them into proration units. To accomplish full unitization they acquired, in 1948, 13 additional leases making 99 in all. During the year 1948, five Gas Units were formed in which the taxpayers participated. They owned all of the leases comprising three of these units. The taxpayers, owning leases on 597.02 acres, and Gulf Oil Corporation, with leases on 106.98 acres, formed a unit called the Woolworth Unit. The taxpayers put leases of 468.52 acres and Stanolind Corporation furnished leases of 235.48 acres to form a unit known as the George Unit.

As an incident to the unitization arrangements and agreements, surveys were required and these were procured at a cost to the taxpayers of $3,200.00. A Pooling and Operating Agreement between the taxpayers and Gulf Oil Corporation and another between the taxpayers and Stanolind Corporation were prepared and executed. Instruments were prepared and filed with the Clerks of the two counties describing each of the Units. Agreements between the owners of royalty interests and the lessees approving proration and unitization were prepared and executed. Attorneys' fees in the amount of $13,932.43 were paid by the taxpayers in connection with the formation of the Gas Units and the preparation of instruments in connection therewith.

In their joint income tax return for 1948, the taxpayers took deductions of the attorneys' fees and surveying charges as expense charges. These were disallowed, a tax deficiency was assessed and paid, suit was brought against the District Director of Internal Revenue, judgment was for the taxpayers and the Government has taken an appeal. The taxpayers contend and the District Court held that the legal and surveying charges were deductible under that portion of the Internal Revenue Code of 1939 providing as follows:

"In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or business expenses.

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *

"(2) Non-trade or non-business expenses. In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income." Section 23(a) (1) (A), 23(a) (2), Internal Revenue Code of 1939 as amended.

The Government takes the position that the controverted items were non-deductible capital expenditures. To qualify for the deduction the expenditure must be ordinary, it must be necessary, and it must be an expense. The disbursement must have been made in carrying on a trade or business, or, in the case of an individual, for the management, conservation or maintenance of property held for the production of income.

There seems to be no dispute as to the facts. The Government controverts the District Court's finding that the taxpayers were required "under the Railroad Commission's Order to unitize, or, pool before they could produce gas on the leases which they owned." The Government points out that under the law of Texas the formation of proration units through pooling agreements shall be voluntary. The Government concedes, however, that the restrictions with respect to the spacing of wells impose an economic burden on operating except under pooling agreements, and that economic advantages are made possible by unitization. Economic pressures can exert controls as compelling as legal sanctions, and such, it seems, was the requirement to which the District Court's finding related.

The Government, citing Bailey v. Commissioner, 1954, 21 T.C. 678, notes that the leases originally held by the taxpayers represented a capital investment since they held the leases, as producers, for investment purposes. It is then urged that by the pooling and unitization there was a modification of the leases resulting in their conversion into unitized proration units calculated to increase their capital value. This approach gives too much consideration to form and too little to substance. Let us examine the nature of the property right as was evidenced by the leases and the extent to which that right was changed by the pooling and unitization.

■ In seeking a solution to the problem presented, light is shed by the Texas Supreme Court in the following language:

"The rule in Texas recognizes the ownership of oil and gas in place, and gives to the lessee a determinable fee therein. [Citing cases.]

"Owing to the peculiar characteristics of oil and gas, the foregoing rule of ownership of oil and gas in place should be considered in connection with the law of capture. This rule gives the right to produce all of the oil and gas that will flow out of the well on one's land; and this is a property right. And it is limited only by the physical possibility of the adjoining landowner diminishing the oil and gas under one's land by the exercise of the same right of capture. The following decisions discuss the law of capture as applied in this state: [Citing cases]. Both rules are subject to regulation under the police power of a state." Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 940, 99 A.L.R. 1107.

Prior to the formation of a proration unit each participant had the right to a share in the gas in the field to be produced through wells on the land owned by or leased to him even though some part of it may have migrated from the lands of others. These rights were correlative, each owner or lessee of land embracing the field having the right to the oil and gas therein subject to like rights of the others. The enjoyment of these rights was limited by the requirement of well spacing imposed by the State of Texas in the exercise of its police power. The well spacing requirement made pooling and unitization necessary in order to preserve and protect the rights of the taxpayers to their proportionate share of the gas in the field. The pooling and unitization here involved covered only the gas rights. Subsequent to the pooling and unitization each owner and lessee has the right to a share in the gas in the field to be produced through wells on the land included in the unit, each participant's portion being measured by the area of his contribution to the unit. His ultimate economic interest is little, if any, different after pooling and unitization than before.

It cannot be said as a matter of law, and we doubt that there could be any accurate determination as a matter of fact, whether the ultimate realization by taxpayers would be greater or less with unitization than without well spacing and unitization. We do not find that the unitization of the leases resulted in any such conversion of the character of tax-

payers' investment as worked a basic change in the nature of the property right which they held. We do not adopt the analogy which the Government would have us draw between the facts here existing and those of cases where capitalization has been required of outlays for alterations and additions to buildings and other structures located on real property.

■■■■ The words "ordinary and necessary expenses" are to be given their rational, practical meaning. Parkersburg Iron & Steel Co. v. Burnet, 4 Cir., 1931, 48 F.2d 163, 165. The probability that the expense will not recur does not prevent its being ordinary. The United States Supreme Court has said:

"* * * an expense may be ordinary though it happen but once in the taxpayer's lifetime." Deputy v. duPont, 1940, 308 U.S. 488, 60 S.Ct. 363, 367, 84 L.Ed. 416.

Perhaps the closest analogy in the reported opinions is to be found in a case decided by this court. Taxpayers, as partners, acquired land in Louisiana upon which adverse claims were asserted to oil and gas rights. Lawyers were employed by taxpayers to assert the taxpayers' rights to oil and gas. Leases were made with considerations payable when the adverse claims had been cancelled and removed. Litigation ensued and the taxpayers' rights were vindicated. The Commissioner of Internal Revenue disallowed the deduction of attorneys' fees on the theory that the expenditure should be capitalized. From the opinion we quote:

"The above-mentioned expenditures for attorney's fees cannot reasonably be regarded as capital investment. They were not payments made in acquiring ownership of lands minerals in or from which were adversely claimed. In making the above-mentioned leases the firm entered into business transactions the object of which was the acquisition of income from oil and gas contained in the leased lands. Von

Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460. The object of the suits brought was the removal of an obstacle to the recovery or realization of income created by the assertion of adverse claims to it. The payments made to the attorneys were none the less business expenses incidental to the realization of income because the rendition of the services was required, not by the refusal of the lessees to make the payments conditionally stipulated, but to comply with the contract obligation to the lessees to enable them to make such payments without being subjected to risk or liability to a third party by so doing. * * * The above-mentioned suits brought by the firm did not involve an ordinary attack on the firm's title to land. In such an action for slander of title, in Louisiana law otherwise termed a jactitation suit, the defendant, by setting up title in himself, stands in the position of a plaintiff in a petitory action, and must make out his case on the strength of his own title, and not on the weakness of his adversary's. Dalton v. Wickliffe, 35 La. Ann. 355. The defendants in the suits brought by the firm admitted the firm's ownership of the lands in question. Wetherbee v. Railroad Lands Co., 153 La. 1059, 97 So. 40. The defendants in those suits set up claims, not to title to lands admitted to be owned by the firm, but to rights to minerals therein or extracted therefrom. What was adversely claimed was part of what was or might be produced from the lands when used in business by the firm or its lessees. To treat as an addition to the cost of land the amount of an expenditure made, after ownership was acquired, to enable the owner, his agent or lessee, to possess and use the land for business purposes, undisturbed by intruders or trespassers, would involve a disregard of the difference between the

cost of acquiring ownership of property and expenses paid or incurred to protect the owner's right to undisturbed possession and enjoyment of his property, and what it yields or produces, by himself, his agents or lessees. It seems reasonable to treat amounts expended for services rendered in ejecting or excluding trespassers after ownership has been acquired as expenses incident to the ownership of property and the acquisition and enjoyment of income from it, rather than as additions to the capital investment in the property. We conclude that the attorney's fees incurred and paid as above stated were ordinary and necessary business expenses which were deductible from gross income under the provision of section 214 (a) (1) of the Revenue Act of 1921, 42 Stat. 227, 239. Kornhauser v. United States, supra [276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505]; Lucas v. Wofford, 5 Cir., 49 F.2d 1027." Bliss v. Commissioner of Internal Revenue, 5 Cir., 1932, 57 F.2d 984, 985.

In a later decision it was said that "all sums expended toward the acquisition, protection, or preservation of title to property from or by means of which income is intended to be produced are capital expenditures". Jones' Estate v. Commissioner of Internal Revenue, 5 Cir., 1942, 127 F.2d 231, 232. So holding, the court said that to the extent, if any, the decision in the Bliss case was in conflict, it was overruled.

In a more recent case legal costs were allowed as deductible expense where paid by a widow in establishing, against her deceased husband's executor, her ownership of property acquired jointly by her husband and herself. The court, after approving the finding of the District Judge that the widow was the bona fide joint owner of the property with her husband, continued:

"So finding, he concluded, with eminent correctness, that the equitable action, instituted by plaintiff to declare her ownership and compel the executors to execute a deed in accordance therewith, was not a suit to obtain or defend title, but was essentially conservatory in its nature, one to conserve income producing property which she already owned, and to free her management from unwarranted fetters." Allen v. Selig, 5 Cir., 1952, 200 F.2d 487, 488.

That the Bliss doctrine, as applied to the case before us, was not overruled by Jones' Estate v. Commissioner is shown by Allen v. Selig. Here the controverted deductions were not made for acquiring property or defending title to property, nor for the purpose of converting one kind of property into some different kind of property. Here the expenses were incurred in order that the taxpayers might realize and enjoy the income from the property.

Although one of the primary purposes of the oil and gas restrictions imposed by the State of Texas was the conservation of the natural resources of the State, the effect was to conserve the oil and gas interests of the individual owners and lessees. Being under economic pressure to enter into the unitization program the expense incurred in so doing was, as in the case of Allen v. Selig, supra, "essentially conservatory in its nature".

Approving, as we do, of the judgment of the District Court, it is

Affirmed.

TUTTLE, Circuit Judge (dissenting).

With deference to the majority of the Court, I think the judgment of the trial court should be reversed. There is nothing in either the complaint or the evidence to support the proposition that the expenditures are deductible under Section 23(a) (1) (deduction of ordinary and necessary expenses paid or incurred in carrying on a trade or business). The complaint refers to them as being expended "for the production and/or conservation of taxable income during such year." This was clearly an effort to

classify them as deductible under Section 23(a) (2) (non-business expenses). In order for them to come within that section they must have been paid or incurred "for the production or collection of income, or for the management, conservation or maintenance of property held for the production of income." Although the taxpayers did not, in their complaint, contend that they were for the management, conservation or maintenance of property held for the production of income, this is their principal contention before us. While, under the Federal rules, we can treat the case as though the plaintiffs made such allegation if the record supports it, it is nevertheless significant that the parties themselves did not contend that these expenditures were for the conservation or maintenance of income-producing property. They proceeded on the theory that the expenditures were for the production and/or conservation of taxable income during the tax year in question, a contention which is clearly unsupported by the record.

While the exact line of demarcation between expenditures that are capital in nature and those that are of the character of current expenses is not entirely clear, the underlying principles are well understood. Expenditures that create or add to assets in a permanent rather than transitory way, are generally considered capital expenditures. Those that are made as a necessary incident to the current production of income or keeping in repair of a physical property, are in the nature of expenses and are thus deductible. If an expenditure does not fall readily into either of these classes it must be viewed in the light of the purpose for which the statutes have drawn a distinction between them.

In another opinion just decided by this Court we have said:

"The language of the statute, together with the legislative history of the section, make it clear that Section 23(a) (2) was added by the 1942 Act to remedy the inequitable situation, which arose in Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783, of an individual being taxed on investment income but being denied the right to deduct the cost of producing that income. Prior to the amendment such cost could be deducted only if the expenditure even though admittedly made in connection with the realization of current income, was made in 'carrying on a trade or business.'" United States of America v. Mellinger, 5 Cir., 228 F.2d 688, 692.

There is obviously nothing in the expenditures made here of the kind contemplated by Congress in enacting Section 23(a) (2).

The parties themselves deal with the newly created unitized holdings as "units." These units are newly created by the very legal services for which the expenditures were made. Such expenditures, it seems to me, are more nearly like payments for legal or accounting services in a merger of two or more corporations. Such an expenditure would undoubtedly be capitalized and would not be deductible as a current expense.

I think that on logic and by virtue of prior pronouncements of this Court, the underlying principle compels a finding in favor of the defendant below. See Morgan Jones' Estate v. Commissioner, 5 Cir., 127 F.2d 231; see also Frishkorn Real Estate Co. v. C. I. R., 15 B.T.A. 463.

I think, therefore, the judgment should be reversed.