WILLIAM DESMOND and DORTHY DESMOND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Desmond v. Commissioner
Docket No. 660-78.
United States Tax Court
T.C. Memo 1980-463; 1980 Tax Ct. Memo LEXIS 120; 41 T.C.M. (CCH) 196; T.C.M. (RIA) 80463; October 20, 1980, Filed Wayne A. Smith, for the petitioners. Harry Beckhoff, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND ORINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax and an addition to tax under section 6653(a), I.R.C. 1954, [1] for calendar year 1973 in the amounts of $42,882 and $2,144, respectively. Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision: (1) whether petitioners are entitled to a $287,165 ordinary and necessary business expense deduction in 1973 for expenditures associated with their cost of goods sold; (2) whether petitioners realized additional income in the amount of $1,964 as a result of withholding *121 "camp rent and board" from their employees' wages; and (3) whether any part of petitioners' underpayment of income taxes is due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. William Desmond (petitioner) and Dorothy Desmond, husband and wife, who resided in Phoenix, Arizona, at the time of filing their petition in this case, timely filed their joint Federal income tax return for calendar year 1973 with the Internal Revenue Service Center, Ogden, Utah. During 1973 petitioner was engaged in the business of commercial lettuce packing under the trade name of Bill Desmond Packing Company, a sole proprietorship. Farmers retained petitioner to harvest their lettuce crops when mature. In addition to harvesting the lettuce, petitioner was responsible for packing and hauling the lettuce to vacuum cooling plants. To perform these business activities petitioner hired a crew of workers who were *122 primarily of Mexican origin. Normally the work crew included persons with the following work functions: (1) folders and stitchers, who unfold flattened cartons into three-dimensional containers and stitch the sides; (2) cutters and packers, who work as a trio--2 cutters and 1 packer--to sever the lettuce and place the head in a carton; (3) closers, who shut and staple each carton after it is completely filled; (4) loaders, who load the cartons onto the truck; (5) truck drivers, who drive the trucks to the cooling plant; (6) field foremen, who oversee the cutters, packers, closers and loaders, and are responsible for maintaining field records to reflect wages due and earnings paid to these workers; (7) a field supervisor, who oversees the entire harvesting process; and (8) if necessary to cleanse the lettuce, a water boy. In 1973 the field supervisor was petitioner's son, Larry. During the year in issue petitioner was hired to harvest lettuce in Arizona and Colorado. In spring 1973 petitioner's crews harvested lettuce on the Anthony Farm in Chandler, Arizona (Chandler project), and in summer 1973 the crews harvested lettuce in Alamosa, Colorado (Colorado project). In fall 1973 *123 petitioner's crews returned to Arizona to harvest lettuce in Marana (Marana project). For each harvesting project petitioner maintained a camp where laborers would sleep and eat their meals if they did not return home for the night. Meals served at the camp were prepared by a hired cook. While petitioner paid for the expense of maintaining the camp, the costs of groceries and meal preparation were deducted from the paychecks of the workers who ate the camp meals. Petitioner also incurred the expense of providing such field supplies as cartons and staples. Additionally, where a farmer hired petitioner to harvest lettuce in a region a long distance from the area in which petitioner hired his crews, in order to assure the existence of a complete work force petitioner sometimes supplied either transportation or money to crew members in payment of their transportation costs. These transportation expenditures were not deducted from the workers' wages. The farmers who hired petitioner compensated him on the basis of numbers of cartons packed by petitioner's crews. In turn, petitioner based his laborers' wage scale on the number of cartons filled, the worker's job function, the *124 location of the lettuce field, and the condition of the field. Pursuant to petitioner's wage system, each field foreman was responsible for preparing the daily field payroll sheets for members of his crew. These payroll spreads noted the wages owed each cutter, packer, closer and loader for work performed during each workday, and normally each sheet contained data on the work each laborer performed over one calendar week. Additionally, because crew members often required advances against the wages earned, where these advances were paid the field foremen noted the amounts of the advances on the weekly payroll sheets. At the end of each week, the field supervisor submitted to these workers the balance of their wages. The folders, stituchers, truck drivers, and field supervisors were not included in the field foreman's crew. Therefore the earnings due to each of these workers were not included on the daily payroll sheets. Rather, these workers were paid directly by petitioner. When petitioner was unable to hire a sufficient number of laborers to completely harvest a project, he subcontracted a second commercial packer who would supply a crew to assist in the harvesting. As in *125 the case of the Chandler project where petitioner did hire a subcontract crew, petitioner submitted to the subcontractor the identical amount that petitioner received from the farmer. The subcontractor became responsible for paying all of his crews' expenses, including their wages, camp rent, transportation, and field supplies. From the beginning of 1973 until December 10, 1973, Bernard Mueffelmann was petitioner's accountant. On December 10, 1973, Mr. Mueffelmann sold his accounting practice to Jack Alexander, who thereafter provided petitioner's accounting services. On October 1, 1974, Mr. Alexander formed an accounting partnership with Henry E. Devoley, who purchased Mr. Alexander's partnership interest in 1976. Mr. Devoley did not perform any accounting services for petitioner with respect to 1973, although he stored certain files which contained petitioner's financial records for tax year 1973. During 1973 petitioner or his son, Larry, generally submitted on a weekly basis the dated field payroll sheets to Mr. Mueffelmann. By the end of each 1973 harvesting project, petitioner had given to Mr. Mueffelmann all completed payroll sheets which were in petitioner's possession. *126 These payroll sheets were placed in files located in Mr. Mueffelmann's office. Additionally, petitioner's bank forwarded all of petitioner's bank statements to Mr. Mueffelmann, who retained the statements on behalf of petitioner. When Mr. Alexander purchased Mr. Mueffelmann's accounting practice, petitioner's files were transferred to Mr. Alexander. In May 1974 petitioner acquired some of his 1973 financial records from Mr. Alexander. Those source records that petitioner did not acquire in May 1974 were subsequently returned to petitioner, and all records were thereafter transferred to petitioner's attorney. For tax year 1973, Mr. Alexander prepared petitioners' income tax return by relying upon documents in his possession. Some of the documents had been prepared by Mr. Mueffelmann, including an undated summary sheet of checks issued by petitioner during a portion of 1973 for the following items: Item
Total Amount
Crew travel
$ 600.00
Field supplies
4,122.05
Licenses
138.80
Gas
104.34
Phone
116.91
Hotel/Motel
57.92
Camp Rent
1,200.00
Contract labor
15,316.32
Insurance
263.60
Accounting
1,250.00
Other: Cost of mobil house
$ 500.00
Mobil house
1,000.00
Trailer space rent
169.95
Travel trailer
2,925.55
Travel tractor
200.00
Bus purchase
3,124.00
Bus
2,665.59
Property tax
48.97
*127 Additionally, Mr. Mueffelmann had prepared a one-page document entitled "Wm. Desmond - 1973 Income." [2] He created this sheet to show a total carton harvest and a gross income factor for the harvesting projects. Additionally, this document indicates that of the cartons harvested on the Chandler project, 20,344 were harvested by contract labor. Moreover, this 1973 income sheet shows that Mr. Mueffelmann considered the accounting fee for the Chandler and Colorado projects to be one-half cent per carton packed. Mr. Alexander did not audit the records previously prepared by Mr. Mueffelmann; instead, Mr. Alexander relied upon the figures determined by his predecessor.
*128 Petitioner's weekly payroll sheets were also available to Mr. Alexander when he prepared petitioners' 1973 tax return. A portion of the payroll records covered the period of April 1, 1973 through May 14, 1973, and included the wages of the Chandler project cutters, packers, closers, and loaders. Petitioner's payroll sheets for the Colorado project included wages paid to crew members from July 20, 1973 through August 22, 1973. The payroll journal for the Marana project covered the period of October 30, 1973 through December 8, 1973. Petitioner's gross wages as reflected in petitioner's payroll records furnished to respondent's agents show in summary the following: Period
Harvest
Amount
4/6 - 5/11
Chandler Project
$ 68,417.22
7/16 - 8/22
Alamosa, Colorado
83,974.70
[Colorado project]
11/3 - 12/8
Arizona Project
36,967.17
[Marana project]
Additionally, the payroll sheets for the Colorado project indicate that petitioner deducted amounts from some of the laborers' gross wages for "camp." These "camp" deductions totalled $1,964. In addition to the weekly payroll sheets, Mr. Alexander relied upon a series of paychecks which had been issued *129 in April, May, October, November, and December 1973, to truck drivers, folders, stitchers, and crew supervisors. Mr. Alexander also depended upon the following canceled checks: Check
Payee
Number
Date
Amount
Purpose
Reynaldo S. Perez
1112
4/27/73
$13,833.92
contract labor
Reynaldo S. Perez
1112
4/27/73
1,482.40
contract labor
Louie Presky
1073
4/5/73
225.00
camp rent
Louie Presky
1088
4/15/73
325.00
camp rent
Louie Presky
1101
4/22/73
325.00
camp rent
Louie Presky
1129
4/28/73
325.00
camp rent
Tony Miaguia
1060
3/22/73
600.00
crew travel
As Mr. Alexander was preparing petitioners' 1973 income tax return, he became aware that he did not have sufficient information to complete the return. The documents which Mr. Alexander possessed did not show the income that petitioner earned from the Marana project, nor all expenditures for field supplies, repairs and maintenance, camp rent, insurance and licenses. In order to supply these missing figures, Mr. Alexander conferred with several commercial lettuce packers other than petitioner, and from these discussions Mr. Alexander used his judgment to approximate petitioner's *130 unknown amounts. Based upon this independent judgment coupled with reliance upon documents in his possession, Mr. Alexander prepared petitioners' Schedule C. He indicated that petitioner realized a gross profit of $37,347 based upon gross income of $324,512 and cost of goods sold of $287.165. [3] Mr. Alexander calculated the cost of goods sold to include both direct and indirect labor, the latter of which he determined to consist of "all the costs of getting the lettuce ready for market * * *," including such items as trucking, field supplies, insurance, depreciation, repairs, and camp costs. Expressed on a per carton completion basis, Mr. Alexander determined that petitioner's cost of goods sold amounted to 63-1/2 cents per carton for the Colorado project and 68-1/2 cents per carton for the Chandler and Marana projects. *131 After Mr. Alexander developed the calculations for petitioners' tax return, he discussed the information with petitioner. Once he had completed the tax return, Mr. Alexander forwarded it to petitioners for their signature. At no time did petitioners indicate that the figures on the completed return were incorrect, although petitioner did comment that he was surprised that he had earned such a large profit. On their 1973 become tax return petitioners claimed $287,165 as their cost of goods sold and $15,316 as contract labor, for a total of the two of $302,481. Respondent disallowed a portion of the claimed cost of goods sold with the explanation that-- It is determined that the deduction of $302,481.00 claimed for wages and contract labor expense is not allowable to the extent of $97,806.00 because it has not been established that any amount in excess of $204,675.00 represents an ordinary and necessary business expense or was expended for the purpose designated. Therefore, your taxable income is increased in the amount of $97,806.00. On their 1973 Schedule C petitioners claimed a deduction for $1,200 paid for camp rent. Respondent determined that petitioner had withheld *132 $1,964 from employee wages for "camp rent and board." Consequently respondent determined that petitioner had-- received additional income in the amount of $1,964.00 from the withholding of "Camp Rent and Board" from your employees' wages while at the same time expensing gross wages and any amounts paid for camp supplies or camp rent; in essence, you duplicated a deducting. Accordingly, your taxable income is increased $1,964.00. Additionally, respondent determined that-- part of the underpayment of the tax for taxable year ended December 31, 1973, is due to negligence or intentional disregard of rules and regulations. Consequently, the 5 per centum addition to the tax provided by section 6653(a) of the Internal Revenue Code is asserted for that year. OPINION Section 162(a) provides in pertinent part that: There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. On Schedule C of their 1973 income tax return petitioners reported a $287,165 cost of *133 goods sold incurred in their commercial lettuce packing business. The first issue for decision is whether petitioners are entitled to this claimed business expense deduction. Respondent argues that petitioners' accountant, Mr. Alexander, determined the cost of goods sold figure without sufficient supportive data. On the whole respondent does not disapprove of Mr. Alexander's reliance upon the payroll sheets and canceled checks supplied by petitioner or the work papers prepared by petitioners' prior accountant. However, respondent disputes the accuracy of certain expense figures, some of which Mr. Alexander calculated from information gathered through discussions with lettuce packers other than petitioner. Respondent takes the position that Mr. Alexander lacked substantive data on petitioner's packing operations to judge accurately these unknown figures. On the other hand, petitioners assert that Mr. Alexander's judgment is supported numerous documents. After a thorough examination of the record we are of the opinion that a portion of the $97,806, which respondent disallowed from petitioners' claimed cost of goods sold, is allowable as an ordinary and necessary business expense *134 deduction. Respondent does not question that petitioners are entitled to deduct the $189,359.09 of wages shown on the payroll records furnished to his agent. These wages are substantiated by payroll sheets dated April 1, 1973 to May 14, 1973, July 20, 1973 to August 22, 1973, and October 30, 1973 to December 8, 1973. The record also contains a payroll sheet covering July 18, 1973, and July 19, 1973, which apparently was not included in the payroll sheets furnished to respondent's agent, with wages totaling $4,406.90. Respondent did not allow this $4,406.90 as a deduction. After reviewing this payroll spread and comparing it to the other payroll sheets, we are convinced that petitioner paid $4,406.90 in wages to named cutters, packers, closers and loaders which are properly includable in petitioners' cost of goods sold figure. Respondent allowed petitioners a deduction for $12,344.13 in wages paid to truck drivers, folders, stitchers and crew supervisors. That $12,344.13 included approximately 51 paychecks issued to these workers. However, respondent failed to allow wages paid by check in April, May, October, November, and December 1973 to a number of workers with these same *135 job functions. Petitioners argue that the wages paid to these workers, totaling approximately $13,655.24 should also be allowed as business expenses, and we agree. Petitioners further argue that a portion of the claimed cost of goods sold figure is attributable to a $6,468.57 expenditure on October 18, 1973. The check is payable to "The Arizona Bank (Cashier Check)." Petitioners indicate that the check written in this amount was in payment for contract labor. We are not convinced that petitioner expended this sum for contract labor. All other checks for contract labor were made payable to Reynaldo S. Perez. Additionally, the payment date on this check post-dates the Colorado project by approximately 8 weeks and pre-dates the following harvesting project in Marana, Arizona, by 11 days. Because there is no other indication as to a possible purpose for this payment, we conclude that it should not be treated as part of petitioner's cost of goods sold. Petitioners admit that a substantial portion of the records supportive of the balance of their claimed $287,165 cost of goods sold is missing. However, petitioners suggest that *136 where a taxpayer is unable to substantiate expense deductions by documentation, and there is no doubt that the taxpayer incurred the expense, this Court should estimate the unknown amounts. See Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930); affg. 11 B.T.A. 743 (1928). Petitioners take the position that if the Cohan rule is applied, the claimed cost of goods sold figure will prove to have been understated and that the net profit was overstated. They submit that an estimation should be based upon the per carton cost factors calculated by their accountant, Mr. Alexander. While we are of the opinion that the Cohan rule is applicable in the instant case, we agree with respondent that Mr. Alexander's cost factors are not necessarily based upon factual data. Clearly, when preparing petitioners' Schedule C, Mr. Alexander felt that projected figures as to numers of lettuce cartons packed and cost information generated through discussions with commercial lettuce packers other than petitioner were valuable tools for calculating the unknown figures. However, we are of the opinion that petitioner's expenses can be adequately reconstructed without *137 utilizing Mr. Alexander's cost factor method. A review of the canceled checks submitted by petitioners which represent wages paid to truck drivers, folders, stitchers, and the crew supervisor indicate that the checks were issued as compensation for their labor on the Chandler and Marana projects. While the record does not contain documents showing that petitioner hired drivers, folders, stitchers, and a crew supervisor for the Colorado project, the testimony indicates that these workers would be an integral part of any lettuce harvesting operation. Therefore, we do not doubt that petitioner engaged truck drivers, folders, stitchers, and a crew supervisor for the Colorado project. Based upon payments to these workers on the Chandler and Marana projects, we conclude that petitioner paid wages to these workers in Colorado in the amount of $10,000. Petitioners argue that a portion of the claimed cost of goods sold figure included expenditures for field supplies, camp rent, repair and maintenance, contract labor, crew transportation, insurance, licenses, and accounting fees. Petitioners take the position that the amounts separately itemized on their Schedule C for these items *138 relate solely to the Chandler project. Respondent argues that several of the itemized expenditures can be connected with checks issued in October and November 1973. An examination of the evidence reveals that the majority of the itemized expenditures were likely incurred by petitioner in the operation of the Chandler project and perhaps the Marana project. Because of the nature or petitioner's lettuce packing business, we do not doubt that he incurred many of these same expenses with regard to the Colorado project. Clearly petitioner had to transport some, if not all, of the Mexican workers to Colorado, and he had to provide them with a camp in which to sleep. Moreover, cartons and staples were as necessary in the operation of the Colorado project as they had been to the other harvesting projects. Additionally, the testimony indicates that subcontracted labor was engaged only as needed and that petitioner was forced to subcontract workers for the Colorado project. Accordingly, invoking the Cohan rule, we conclude that petitioner expended approximately $10,000 in addition to those expenditures itemized on his Schedule C. Petitioner contends that at least 45,000 cartons *139 of the 143,088 cartons packed at the Marana project were packed by contract labor. Mr. Desmond's testimony is clear that some of the lettuce at Marana was packed by contract labor but is not precise as to the amount of lettuce packed by contract labor. He stated "I would say that they at least helped me out around 45,000 cartons." He further stated "I packed more than they did." We consider Mr. Desmond to be a truthful witness and therefore accept without question his testimony that some of the 143,088 cartons packed at Marana were packed by contract labor. Furthermore, the balance of the record supports this conclusion. Mr. Desmond's labor costs on the Chandler project for packing 152,529 cartons were $68,417.22 or about 45 cents per carton. His labor cost at Marana was $36,967.17 or on the basis of 143,088 cartons approximately 26 cents per carton. The testimony in the record is clear that the wage rates at the Chandler and Marana projects were approximately the same. We of course recognize that some differences in wages per carton would exist but a difference of 19 cents a carton is not realistic. The per carton difference in amount of wages paid by petitioner in Chandler and *140 Marana is clear support for petitioner's position that some work at Marana was done by contract labor. Petitioner could not remember the name of the person who did the contract work and could not find checks to support the payments. However, the record strongly indicates that some of the checks written by petitioner in 1973 have been lost. The record of payments to petitioners by Anthony Farms shows weekly payments to petitioner from November 5, 1973 through December 7, 1973, totalling $82,199.60. The record shows that petitioner was paid at the rate of 68 cents a carton on the Marana project. Petitioner argues that this record indicates that he did not actually receive $97,299 from the Marana project. However, based on a rate of 68 cents a carton, if petitioner packed 143,088 cartons he would have received the $97,299 he reported on his return from this project. Certainly petitioner has not proved to the contrary. However, a possible explanation for the $15,100 difference in the payment shown on the Anthony Farms books and on petitioners' return is that petitioner departed from his normal procedure of having Anthony Farms pay him for cartons packed by contract labor. Since *141 the record shows that he paid the contractor the exact amount he received, petitioner may have had Anthony Farms pay the contractor directly for some of the contractor's work on the Marana project. From the record as a whole our best judgment is that petitioner is correct in his estimate that at least 45,000 cartons on the Marana project were packed by contract labor. We therefore hold that petitioner is entitled to deduct $30,600 for contract labor on the Marana project. In summary we hold that in addition to the deductions allowed by respondent, petitioner is entitled to deduct the following: Additional payroll labor -
$ 4,406.90
Additional wages to truck drivers,
folders, stitchers, and crew
supervisors on Chandler and
Marana projects -
13,655.24
Wages to truck drivers, folders,
stitchers, and crew supervisors
on the Colorado project -
$10,000.00
Field supplies, camp rent,
repairs and maintenance,
contract labor, crew transportation,
insurance, licenses
and accounting fees on the
Colorado project -
10,000.00
Contract labor on the Marana
project -
30,600.00
The second issue is whether petitioner realized additional income in the amount *142 of $1,964 as a result of withholding "camp rent and board" from his employees' wages. Respondent argues that in order to be recompensed for expenses associated with maintaining a camp, petitioner withheld $1,964 from the wages earned by his Colorado project employees.Respondent submits that petitioner included the $1,964 as a portion of his cost of goods sold since gross wages constituted a major part of the claimed $287,165. Respondent points out that petitioner additionally itemized a deduction of $1,200 for camp rent. Respondent contends that these claimed amounts overlap in part and result in a duplicated deduction. On the other hand, petitioners argue that there is no duplication. Petitioners assert that the $1,200 "camp rent," substantiated by canceled checks, constituted only an amount paid by petitioner for rental of property in Arizona where laborers on the Chandler project could establish sleeping quarters. Petitioners submit that the $1,964 represents the cost of the employees' food in Colorado. They assert that it was the responsibility of the laborers to pay for their own groceries. As a service to the employees petitioner collected the moneys owed to the grocer *143 by withholding the appropriate amount from each employee's earnings, and he remitted the funds directly to the grocer. Therefore, it is petitioners' position that the $1,964 solely represented employees' payments for their own board, whereas the $1,200 "camp rent" expense was for the rental of property. We agree with petitioner that the $1,200 was paid for a camp near Phoenix which was used in connection with the Chandler and Marana projects. In fact in determining additional expense for the Colorado project, we included an amount for camp cost. The record, however, shows that petitioner collected amounts from the workers to pay for the groceries used by them for their meals and the preparation of those meals. Petitioner's testimony is that the total amount withheld from the wages was paid out by him for groceries used by the workers and for preparation of the workers' meals. There is no indication in the record that these payments were deducted by petitioner as expenses in computing his taxable income. It is not clear why the amounts withheld were shown on the payroll records for the Colorado project and not for the other projects. However, considering the evidence as a whole *144 we conclude that petitioner did not receive any income from this withholding.
The final issue for decision is whether any part of petitioners' underpayment of income taxes is due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). Respondent argues that the filing of a correct income tax return is a personal responsibility and that petitioners cannot escape this duty by thrusting it upon the accountant who prepared their tax return.Citing Ma-Tran Corp. v. Commissioner,70 T.C. 158, 172-173 (1978), and Enoch v. Commissioner,57 T.C. 781, 802 (1972), respondent asserts that where, as here, a taxpayer supplies his accountant with incomplete books and records which are used by the accountant in preparing the taxpayer's tax returns, reliance upon the accountant to prepare a correct tax return does not absolve the taxpayer of this personal duty. Petitioners argue that it was the accountant, rather than petitioners, who was negligent. Petitioners contend that their accountant's testimony shows that petitioners provided him the necessary information to correctly prepare their tax return, but "for *145 various reasons, [he] did not bother to use them in preparing Petitioner's return." Upon review of the record, we are not convinced that petitioners furnished their accountant with complete records from which a proper tax return could be prepared. While we do not agree with the method used by petitioners' accountant in reconstructing petitioners' expenses, it was petitioner's failure to maintain adequate and accurate records which necessitated a reconstruction. Where a taxpayer fails to maintain adequate or accurate records or ledgers from which the proper income and deductions are determinable, the 5 percent addition to tax may be imposed. Zivnuska v. Commissioner, 33 T.C. 226, 240 (1959). Petitioner testified that he delegated the responsibility of maintaining the proper daily payroll records to the crew foremen. In so testifying, petitioner gave the impression that he did not supervise his crew foremen in maintaining their records. Moreover, petitioner admits that he was not a skilled bookkeeper, and the evidence clearly indicates that any records which petitioner *146 himself might have maintained with regard to non-wage expenditures were certainly inadequate. As we held in Leroy Jewelry Co. v. Commissioner, 36 T.C. 443, 445-446 (1961), a taxpayer who makes no effort to prevent errors in bookkeeping is negligent within the meaning of section 6653(a). It is ultimately petitioners' responsibility to file accurate tax returns, and they may not foist that responsibility onto any agent. See Bailey v. Commissioner, 21 T.C. 678, 687 (1954). Citing Kilborn v. Commissioner, 29 T.C. 102 (1957), petitioners argue that section 6653(a) is inapplicable because respondent completely failed "to specify the basis" on which he made the determination that a portion of petitioners' underpayment of tax was due to negligence. [3] Clearly the facts of Kilborn, supra, are distinguishable. There, respondent never asserted the ground on which he had based the determination of the application of the 5 percent additions to tax. Respondent made no mention of his rationale during his opening statement or any other time at trial. Nor did respondent address it on brief. *147 In contrast to Kilborn, supra, in the instant case, respondent stated the basis for the determination several times. In his opening statement and on brief respondent indicated that the determination was based on the inadequacy of petitioner's books and records. Therefore, Kilborn, supra, does not control the facts here. In accordance with the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
2. Those portions of the "Wm. Desmond - 1973 Income" document prepared by Mr. Mueffelmann are as follows: 4-25 Anthony Farm, Chandler
76,389
68
51,944.52
(20,344)
4-11 Anthony Farm, Chandler
14,638
68
9,953.84
4-4 Anthony Farm, Chandler
4,322
68
2,938.96
4-18 Anthony Farm, Chandler
41,184
68
28,005.12
5-2 Anthony Farm, Chandler
11,573
68
7,869.64
5-2 Anthony Farm, Chandler
1,598
71
1,134.58
5-9 Anthony Farm, Chandler
15,437
68
10,497.16
5-16 Anthony Farm, Chandler
7,732
68
5,257.76
152,529
117,601.58
at.005
762.65
7-16 - 8-22
Alamosa, Colo.
145,179
.755
109,610.15
at.005 = 725.90
11-3 - 12-8
Arizona (will advise income)
The following was added to the document by Mr. Alexander: ↩
143,088 ctns at.68
97,299.84
.05
324,511.57
715.44
3. The relevant portions of the Schedule C of petitioners' 1973 income tax return are as follows: Gross receipts
$324,512
Less: Cost of goods sold and/or
operations
287,165
Gross profit
37,347
Total income
37,347
Depreciation
1,374
Rent on business property--camp
rent
1,200
Repairs
117
Insurance
264
Legal and professional fees
1,250
Other business expenses: Crew transportation
$ 600
Licenses
139
Gasoline
104
Telephone
117
Motels
58
Contract labor
15,316
Trucking
6,470
Field Supplies
4,122
Total other business expenses
26,926
Total deductions
31,131
Net profit
$ 6,216
Respondent in his notice of deficiency did not disallow any of the claimed business expenses totaling $31,131. These items are not in issue as such. The only issue is whether there items cover all such expenses for all three projects or only a part of the amounts actually spent by petitioner on the three projects.↩
3. Petitioners also cite Scotten v. Commissioner, T.C. Memo. 1966-206, affd. per curiam 391 F.2d 274↩ (5th Cir. 1968). However, the facts in that case are distinguishable from those of the instant case in that there the taxpayers informed their accountant that they had been reimbursed for automobile mileage expenses connected with business. The accountant chose not to include the reimbursements in the taxpayers' gross income because it would only require a deduction in the same amount, and therefore it would be a wash item. The accountant alone erred. Here, the accountant was not given complete information by petitioners, and he was not the sole party to err.